## STATE *v.* HANSEN.

[S. C. 35 Pac. 976.]

1. INSANITY AS A DEFENSE TO MURDER— CODE, § 706 — EVIDENCE OF SUBSEQUENT CONDUCT.— On the defense of insanity superinduced by alcoholism, the sheriff's testimony that on the day after the homicide accused had no symptoms of delirium tremens, is admissible, in the trial court's discretion, even if the sheriff be not so intimate an acquaintance as to make his opinion, with reason given, competent, under Hill's Code, § 706, since it is within the discretion of the trial court to admit evidence of the acts, conduct, and habits of the accused at such subsequent time as would fairly justify any inference of insanity relating back to the time of the alleged offense.

2. WITNESS— CONTRADICTORY STATEMENTS.— Accused having, before consulting counsel, formally confessed that he struck his wife the fatal blow after she had quarreled with and thrown a rock at him, and a witness having sworn that accused told him that he struck the blow without provocation, on a sudden impulse, which he could not explain, there was no error in admitting testimony that such statement was made after accused had consulted with his counsel, there having been no effort made to argue that the defense of insanity was devised by counsel at such visit, or to show what occurred at the visit at all.

3. EVIDENCE TO CORROBORATE CONFESSION.— On a trial for murder of defendant's wife, evidence tending to prove that deceased kept her money in the bureau drawer and carried the key in her pocket; that, when the body was discovered the key was not there, but was found in the bureau drawer; that defendant just before the alleged homicide had no money ; and that when the sheriff arrested him the next day after the homicide there was found upon his person over fifty dollars, is admissible to show his connection with the commission of the crime, the motive for its perpetration, and as tending to corroborate a confession made by him that he took the key from her pocket and opened the bureau drawer.

4. ENTIRE INSTRUCTIONS—JURY TRIAL.— On a trial for murder in which the defense of insanity is set up, an instruction that the burden is upon the party claiming insanity as a defense to make out such defense beyond a reasonable doubt, and that if the jury have "any doubt" as to whether the defendant was sane or insane at the time of the commission of the crime the state is entitled to the benefit of the doubt,— is not reversible error, as it will be presumed that the word "any," used in the connection in which it was, referred to any reasonable doubt; and further because the jury could not have been misled in view of the other instructions given. The rule is the same in criminal as in civil cases, that instructions must be considered in their entirety, and a single instruction that might be subject to criticism, when not misleading, will not justify a reversal, if properly limited by correct instructions.

5. INTENT AS A TEST OF CRIMINAL LIABILITY—INTOXICATION—HILL'S CODE, § 1358.— Where the existence of a particular motive, purpose, or intent is necessary to constitute a particular species or degree of crime, and intoxication is an element of the defense, ( Hill's Code, § 1358,) the intent is the test of criminal liability, regardless of the motive or purpose.

6. HOMICIDE—INSTRUCTION TO JURY.— An instruction on a trial for murder, that if deliberation, premeditation, malice, " or " cool blood existed, and the killing is the result of "them," the fact that defendant was intoxicated when he committed the crime is no defense, is not reversible error, notwithstanding the use of the word " or," as by the use of the word " them " it follows that all of the elements described were necessary to overcome the fact of intoxication if it existed.

7. HOMICIDE—CORROBORATIVE EVIDENCE OF DELIBERATION.— Where there is evidence that before the crime defendant had no money, that when he was arrested the day following he had over fifty dollars, that deceased kept her money in a bureau drawer and carried the key in her pocket, and that when the body was discovered the key was not in it, and that defendant opened some of the drawers of the bureau before he notified any one of her death, it is a question of fact for the jury whether defendant had deliberated and premeditated upon the commission of the act.

8. INSANITY AS A DEFENSE TO CRIME— CODE, § 1358.— Under Hill's Code, § 1358, requiring insanity, as a defense, to be proved beyond a reasonable doubt, the jury's finding on that question cannot be disturbed.

9. IDEM.— Where a defense is insanity, the burden of proof always remains with the defendant: Code, § 1358.

APPEAL from Clatsop: THOS. A. MCBRIDE, Judge.

The defendant was indicted, tried, and convicted of the crime of murder in the first degree, by striking and killing his wife, Caroline Hansen, in Clatsop County, and a motion for a new trial having been overruled by the court, the defendant was sentenced to be hanged. From this judgment he appeals, and assigns as error the admission of certain evidence and the giving and refusal of certain instructions. We shall consider the assignments in the order in which his counsel presents them.

AFFIRMED.

*Mr. Charles W. Fulton,* for Appellant.

*Messrs. Geo. E. Chamberlain,* Attorney-General, *W. N. Barrett,* District Attorney, and *F. D. Winton,* for the State.

Opinion by MR. JUSTICE MOORE.

1. He contends that the court erred in admitting in evidence the testimony of H. A. Smith, sheriff of said county. The defense interposed was insanity superinduced by the excessive use of alcoholic liquors, to support which evidence was introduced tending to show that for about eleven years prior to the alleged homicide the defendant had been in the habit of becoming intoxicated whenever he could obtain liquor; that upon returning to his home after a drunken spree he was restless and could not sleep nor work continuously at anything, but changed from one thing to another, and that these nervous symptoms continued for about eight or ten days after each of his periodical sprees; that when he had been drinking for some time he talked to himself as if he imagined there was a little man in his boat to aid him in picking up his net; that at times, when under the influence of liquor, he laughed, danced, and cried alternately; that during these sprees, or while

getting sober, he was moved to tears by the mention of
his wife's name in his presence; that deceased was killed
Wednesday, July twenty-sixth, eighteen hundred and
ninety-three, and that for some time prior to the preced-
ing Sunday the defendant had been in Astoria, had pur-
chased while there two gallons of whisky and was so
much under its influence on that Sunday that he re-
mained in his boat alone without any apparent purpose
and talked to himself; that on the evening of that day
his wife had him brought home, where he remained
until Tuesday night, when he went out fishing on the
Columbia River; that on the following morning he
visited a neighboring fisherman to whom he complained
of being sick and took three drinks of whisky, and par-
took of some bread and coffee, but when offered beefsteak
he said he could not eat it; that after partaking of these
refreshments he went home and retired to rest; that
about five o'clock that evening he informed a person
working near his house that some one had killed his
wife. Upon the defendant's symptoms, thus described,
hypothetical questions were asked medical experts, whose
answers thereto tended to show that at the time of the
alleged homicide defendant was insane. To rebut this
evidence, the state, over the objection of defendant's
counsel, was permitted to show by the testimony of H. A.
Smith, the said sheriff who took the defendant into his
custody the day after the tragedy, that in his opinion the
defendant was perfectly sane on the day he was arrested.
The objection to this evidence was made upon the ground
that it did not appear that the witness was an intimate
acquaintance of the defendant. The bill of exceptions
shows that the witness had known the defendant for five
or six years; that he saw him every month or so when
he came to town, and that said witness made the follow-
ing answers to questions propounded to him: "Q.—

Were you intimately acquainted with him? A.—I was for about two years; not very intimately, but at the time I belonged to the Fisherman's Union." "Q.—He was in your office quite frequently during those two years? A.—Yes, sir." "Q.—Were you up to his place visiting? A.—Not until this time." "Q.—How frequently during these two years did you see him? A.—I didn't pay any attention; it might be a month or so, or a couple of weeks." "Q.—Do you know him well? A.—I know him pretty well." Upon these answers to the foregoing questions the court permitted him to express an opinion upon the mental condition of the defendant. He also testified that he took the defendant to jail about eight o'clock in the evening, and saw him about three times during the night after his arrest, and that he did not notice any tremor of his muscles.

Section 706, Hill's Code, provides that evidence may be given on the trial of the following facts: "10. * * * the opinion of an intimate acquaintance respecting the mental sanity of a person, the reason for the opinion being given." It is not every acquaintance that is competent to give an opinion in such cases, but it must be one who has close social relations with the person whose mental condition is the subject of inquiry. There are, however, degrees of intimacy, and it is within the discretion of the trial court to say when the witness has shown himself competent and qualified to express an opinion upon the subject, and this discretion, when exercised, will not be reviewed except in case of abuse: *People* v. *Pico*, 62 Cal. 52; *People* v. *Levy*, 71 Cal. 618, 12 Pac. Rep. 794; *State* v. *Murray*, 11 Or. 413. But even if reviewable and found to have been exercised erroneously, the defendant could not have been injured by this evidence, for the reason that it was confined to the defendant's symptoms, and that the sheriff's opinion was predicated upon

his mental condition on the day after the alleged homicide. The fact that he did not have the symptoms of a person suffering from an attack of delirum tremens, and was not then, in the opinion of the officer, insane, did not prove that at the time the act was committed he was not laboring under an insane delusion. The most that can be claimed for it is, that it might strengthen the inference that if the defendant did not have those symptoms, and was not, in the opinion of the witness, insane the day after the commission of the act, that, therefore, he was sane when it was committed. It is within the discretion of the trial court to admit evidence upon the question of the sanity of the person accused, at the time of committing an offense, and of his acts, conduct, and habits at a subsequent time which would fairly justify any inference of insanity relating back to the time of the alleged offense: *Commonwealth* v. *Coe,* 115 Mass. 481; *Commonwealth* v. *Pomeroy,* 117 Mass. 143.

2. The state, upon the cross-examination of Victor Hansen, defendant's son, showed by him that the first time he saw his father after he was placed in jail, was on Saturday forenoon, and, over objection, was permitted to show that defendant's counsel was with him at the jail and had a conversation with his father. The record shows that on Saturday morning, just before the defendant was visited by his counsel, he made the following confession:—

"On Wednesday, July twenty-sixth, last, I was duly sober all day. I left Burnside's scow about half past six and went home and met my wife coming from Svenson's; when I got in the house I laid down on the sofa. She said if you don't go to work I will kill you. I said I have been out fishing all night, and I now want to rest. I then went up stairs to bed. I slept then until the steamer Miler whistled. In the afternoon, about fifteen

minutes after three, I then got up and went down stairs
to urinate, and my wife was then sitting in front of the
house.    After I got through urinating I went up stairs
again and laid down in the bed until about forty-five
minutes after three.    I went down stairs again, and my
wife told me to help her pick berries.    I said I have lit-
tle time, but I will help you, anyhow, but I want to give
the chickens water first.    My wife was then in the rasp-
berry patch alongside of the chicken-house picking ber-
ries.    I then helped her pick berries.    While we were
picking berries, she said:    If you don't leave the place I
will kill you.    I said, I don't want to leave.    She then
picked up a rock and throwed it at me.    I had a stick
and an ax standing by the chicken-house, with the in-
tention of driving it out in the pasture to tie the calf on.
The stick was about three feet long with a knot close to
the end.    I struck her with that stick, and the knotty
part hit her on the head.    I was standing behind her a
little to the left, and she was stooping down a little pick-
ing berries.    She never said nothing after she fell in the
place where she was found.    I staid there with her until
she was dead.    I then went back to the house and staid
there about two minutes, and then went back again to
where my wife laid and looked at her, and then went
away again.    It was about forty-five minutes after four.
I then went to the tide land and notified John Nylund,
and told him the same as I testified to at the coroner's
inquest.    After I came back from the tide land, before
Nylund got to the house, I chopped part of the stick I
killed my wife with and put it in the woodbox, and that
evening burned it up in the stove.

"JOHN HANSEN.

"Signed in the presence of:

"H. A. SMITH.
"F. I. DUNBAR.

"Done on Saturday morning, July twenty-ninth, eighteen hundred and ninety-three."

The following statement was made by the defendant and added to the confession, but was not signed by him: "After she was dead and lying where she was found, I took the keys out of my wife's right-hand pocket of her dress, and I went in the house and opened the lower drawer of the bureau to look for some papers, and found a bottle of kimmell. There was about one good swallow in the bottle, and I drank that, and then took out the keys and put them in the upper drawer, but I never opened it. I was duly sober and in good humor."

The confession was introduced in evidence by the state, which also called Peter Svenson, who testified that defendant, while in jail, and after he had seen his counsel, in speaking of the alleged homicide, admitted "that he did it," and said: "There was a club lying there that was to change the calf in the pasture, and he took up that club to change the calf, and all of a sudden he had an impulse and took the club and hit his wife over the head. He said he had no cause for it whatever, and he didn't know at that minute what he done it for, but he said he done it, and he didn't hardly know how it happened himself at the time." The latter confession materially differed from the former, and tended to support the theory of the defense. In offering it in evidence on the part of the prosecution, the witness was permitted to testify that it was made by the defendant after consultation with his counsel. This it is contended was error. No evidence was offered of what was said at any time between the defendant and his counsel. How, then, was he prejudiced by proof of the fact that his counsel visited and conferred with him? He had a right to employ and consult counsel in order to prepare for his defense. The bill of exceptions does not show that counsel for the state

alluded to or commented upon this fact in the argument, or that defendant took exceptions to any argument tending to lead the jury to infer that the theory of the defense was formulated at the time defendant and his counsel had this conference. The question to which the testimony objected to was a response was asked in the cross-examination of the defendant's witness upon a collateral matter, and in such case it is largely within the discretion of the trial court to say to what extent the inquiry shall be extended: Greenleaf on Evidence, § 449.

3.  The defendant's counsel contends that the court erred in admitting testimony as to the nature and value of the estate of deceased. The testimony objected to tended to prove that deceased kept her money in the bureau drawer, the key to which she was in the habit of carrying in her pocket; that when the body was discovered the key was not there, but was found in the bureau drawer; that defendant, just prior to the alleged homicide, had no money, and that when the sheriff arrested him there was found upon his person fifty-two dollars. It also appears that the state was permitted to show by Victor Hansen, administrator of his mother's estate, over the objection of defendant's counsel, that after his mother's death he found in said bureau drawer five dollars in money, and certificates of deposit and notes to the amount of twelve hundred dollars. This evidence was admissible as tending to corroborate the defendant's confession, to show his connection with the commission of the crime and the motive for its perpetration: *Hendricksen* v. *People*, 10 N. Y. 13, 61 Am. Dec. 721.

4.  The defendant's counsel contends that the court erred in giving the sixth instruction, to which he excepted, and which is as follows: "Among the defenses suggested in this case is insanity. The defense of insanity or mental incapacity to form an intent, or to deliberate,

is a defense that the defendant has a perfect legal and
moral right to avail himself of, if he can establish it, and
it is your duty, under your oaths, to give to the evidence
on this branch of the case the same careful consideration
that is required of you as to the other portions of this
case. The law presumes every man to be sane until he
establishes in the mind of the jury, beyond a reasonable
doubt, the fact of his insanity. In other words, the bur-
den is upon the party claiming insanity as a defense, to
make out that defense beyond a reasonable doubt. And
if you have any doubt as to whether the prisoner at the
time of the commission of the alleged homicide, if he did
commit it, was sane or insane, the state is entitled to the
benefit of such doubt, and you should reject such de-
fense." The court in its general charge correctly defined
a reasonable doubt, and in the foregoing instruction in-
formed the jury that "the law presumes every man to be
sane until he establishes in the mind of the jury, beyond
a reasonable doubt, the fact of his insanity. In other
words, the burden is upon the party claiming insanity as
a defense, to make out that defense beyond a reasonable
doubt." Then the court says: "Now, if you have any
doubt," etc. What meaning could a person of common
understanding gather from the word " any " used in that
connection other than that it referred to such a doubt as
he had twice previously alluded to in the same para-
graph? The word "such" might have been a better
selection, but, however that may be, to hold that the jury
were instructed that if they entertained any doubt, how-
ever slight or trivial, they must give the state the benefit
thereof, would be to render the preceding part of the
charge perfectly senseless. But assume that the word
reasonable was inadvertently omitted after the word
"any," was the alleged error corrected by other instruc-
tions? "Although," says Mr. Rice, "an instruction, con-

sidered by itself, is too general, yet if it is properly limited by others given on the other side, so that it is not probable it could have misled the jury, judgment will not be reversed on account of such instructions": 3 Rice on Evidence, § 140.

The seventh and tenth instructions given by the court are as follows:—

"7th. It is not every crochet or mere crankiness, or eccentricity of mind, however well established, that will excuse the commission of an act, otherwise criminal. If a party, notwithstanding some mental disease or infirmity, still has reason enough to know the act which he purposes to commit is wrong and unlawful, and knows its nature and quality, and has left the power of deliberation and premeditation, and the power to do or refrain from doing the act charged as a crime, such mental disease will not avail as a defense. In other words, while the law will not punish a man for an act which is the result of or produced by mental disease, it will punish him for an unlawful act not the result of or produced or influenced by mental disease, even though some mental unsoundness is shown to have existed. Voluntary drunkenness is no excuse for a crime, and our statute provides that no act shall be any less criminal by reason of the fact that the party committing it was in a state of voluntary intoxication. You can, therefore, only consider intoxication in determining whether or not the defendant was in such a state of mind as to be capable of having an intent to kill, and in determining whether there was premeditation, deliberation, malice, or cool blood. 'There shall be some other evidence of malice than the mere proof of the killing, to constitute murder in the first degree, unless the killing was effected in the commission or attempt to commit a felony; and deliberation and premeditation, when necessary to constitute murder in the

first degree, shall be evidenced by poisoning, lying in wait, or some other proof that the design was formed and matured in cool blood, and not hastily upon the occasion.' But if deliberation, premeditation, malice, or cool blood existed, and the killing was the result of them, the fact, if it be a fact, that he was intoxicated, or under the influence of liquor, when he committed the alleged homicide, if you find that he did commit it, is no defense; that is to say, if he was too much intoxicated or too insane to deliberate or premeditate, you cannot convict him of murder in the first degree. If he was too much intoxicated to have an intent to kill, you cannot convict him of murder in the second degree, and if, from all the testimony in the case, you have a reasonable doubt on these subjects, you should give him the benefit of such doubt; but beyond this you cannot go; remembering all the time that the law presumes every man sane and sober until the contrary state is shown to exist."

"10th. This is a criminal case, and, before you can convict the defendant, you must be satisfied beyond a reasonable doubt of every fact necessary to constitute the crime charged in this indictment; that is to say, if you have a reasonable doubt as to any fact that would be necessary to constitute murder in the first degree, you could not convict him of murder in the first degree. If you have a reasonable doubt as to the deliberation, premeditation, malice, or purpose, you could not convict him; if you have a reasonable doubt as to the malice and purpose, you could not convict him of murder in the second degree. He has the right to the benefit of a reasonable doubt at all stages of the case. But by reasonable doubt is not meant every possible doubt that may arise in a man's mind, because there is nothing but what is open to some possible doubt. It has been defined as a doubt that leaves your mind in that condition that

you cannot say you have an abiding conviction, to a moral certainty of the truth of the charge, and, therefore, of the guilt of the defendant. It must be a doubt arising naturally out of the facts of the case. It is not a mere imaginary doubt, conjured up from your sympathies or from your prejudices, or to escape the consequences of a verdict, but it must be a substantial doubt,— such a doubt as would cause you to pause and hesitate upon the most important affairs of your life. If you have such a doubt, you should give the defendant the benefit of it. If you have a doubt whether he killed the deceased or not, or whether the blow was the cause of the killing, or if you are satisfied the killing was unlawful, but if you have a doubt as to what degree it is, you should acquit him of the degree concerning which you have a reasonable doubt. You should give the defendant the benefit of all reasonable doubts; and there is no technical way of judging it, other than using your ordinary, plain, common sense and judgment. You are to take this testimony and judge it as a whole, weighing all the facts in the case." In *State* v. *Johnson,* 8 Iowa, 525, 74 Am. Dec. 321, an instruction had been given that failed to contain the element of premeditation, in defining the crime of murder in the first degree. The bill of exceptions in that case did not include the other instructions, and it nowhere appeared that this element had been correctly defined, yet the court, in commenting upon the probability of the correct interpretation of the element of premeditation being contained in the other instructions, say, " if it so appeared from the record, we might be justified in holding, taking the instructions together, that there was no prejudice to the prisoner's cause from its omission in the third instruction." " It is not contended," says SEEVERS, C. J., " that every proposition should be accompanied with or qualified by the

doctrine of reasonable doubt. It is sufficient if the court says that every fact necessary to convict must be established to their satisfaction beyond a reasonable doubt": *State* v. *Maloy*, 44 Iowa, 104. If then the omission of the word reasonable made the instruction too general, it was properly limited by others.

The remaining question is directed to the inquiry, Is it probable that the jury was misled by the omission? Whenever the instructions, considered as a whole, are substantially correct, and could not have misled the jury to the prejudice of the defendant, the judgment will not be reversed because some instruction, considered alone, may be subject to criticism: *People* v. *Cleveland*, 49 Cal. 577; *Story* v. *State*, 99 Ind. 413. It must be presumed that each member of the jury possessed, at least, ordinary common sense, and was capable of understanding the whole charge in its connected relations, and in its application to the facts of the case: *People* v. *Bagnell*, 31 Cal. 409. The instructions given by the court fully state the law as applicable to the facts of the case at bar, and the judgment ought not to be reversed except for some palpable error which would afford a dangerous precedent: *Stout* v. *State*, 90 Ind. 1. Courts owe a duty to persons accused of the commission of crime, to see that they have a speedy, fair, and impartial trial in the mode prescribed by law, and, while this is true, they also owe a duty to society to suppress crime and punish those who have been legally convicted thereof. In the discharge of this duty we are not unmindful of the importance of avoiding the adoption of any rule which might become dangerous as a precedent, but we fail to see that any dangerous precedent would be established by adopting the rule that instructions should, in criminal as well as in civil cases, be considered in their entirety, and that a single instruction which might be subject to the criticism of being too

general, when not misleading, furnishes no just reason for reversing a judgment, when properly·limited by other instructions that correctly state the law.

5.   Defendant's counsel contends that the court erred in refusing to give the following instructions, requested by the defendant: "3d.   I charge you further, in regard to the question of the defendant's intoxication at the time of the killing of deceased (if you find that he killed her), it is provided by the statutes of this state that 'whenever actual existence of any particular motive, purpose, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the defendant was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act.'   Now, in order to constitute the crime charged, there must have been purpose and intent on the part of the defendant to commit it, and, therefore, if you find that at the time of killing deceased (if you find defendant did it), defendant was intoxicated to such an extent, or laboring under temporary insanity by reason of previous intoxication or excessive use of alcoholic liquors to such a degree, that he was incapable of forming a purpose or intent, you cannot find him guilty of murder in the first degree."   "4th. The fact (if you should so find it) that defendant killed the deceased, even though you should find that he did it wilfully and maliciously, it is not sufficient alone to convict him of murder in the first degree.   In addition to these elements, there must be proof of deliberation and premeditation, and in order to prove premeditation and deliberation, there must be some evidence of a design, of premeditation and deliberation such as would be evidenced by lying in wait, by the administering of poison, or some kindred act showing a previous consideration of the act; and that the act was done deliberately, formed

and matured in cool blood, not hastily upon the occasion, otherwise you cannot find the defendant guilty of murder in the first degree."

The questions presented by these requests are embodied in the seventh instruction given by the court. That portion of section 1358 of Hill's Code applicable to the question of intoxication as a defense is as follows: " Whenever the actual existence of any particular motive, purpose, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the defendant was intoxicated at the time in determining the purpose, motive, or intent with which he committed the act." It will be observed that the instruction given by the court omitted the words "purpose and motive" and limited the inquiry to the defendant's state of mind as to whether, from the effect of intoxication, he was capable of having an intent to kill. His motive for the act may have been to acquire personal gain or to gratify his anger or revenge, and yet, if he were too intoxicated to premeditate and deliberate upon an intent to kill, he could not have been convicted of murder in the first degree, as the court charged the jury. The intent with which he committed the act, and not the motive or purpose, is the test of his criminal liability in determining the degree of his guilt, and hence, under the evidence in the case, the omission of these words could not have been prejudicial to his rights, under the instruction given by the court. Had self-defense been the issue, as indicated in the first confession, then the motive and purpose of the act might have been material questions, but this theory was abandoned, and the defense of an insane, irresistible impulse was substituted therefor, in which motive and purpose, under the evidence in the case, did not form an element.

6.   Another objection to the seventh instruction, as

presented by the requests, is urged to that part of it which
says: "But if deliberation, premeditation, malice, or
cool blood existed and the killing is the result of them,
the fact, if it be a fact, that he was intoxicated, or under
the influence of liquor, when he committed the alleged
homicide, if you find that he did commit it, is no de-
fense." From this it is contended that the court told the
jury in effect that if malice existed, then intoxication
could not be considered; that the use of the word "or"
after the word "malice" made either element, viz., delib-
eration, malice, or cool blood, sufficient to constitute mur-
der in the first degree, and that intoxication would not
reduce the grade. This contention might be tenable if
the court had used the word "either" in referring to the
several elements, but it will be observed that the word
there used is "them," and hence it follows that all these
elements were necessary to overcome the fact of intoxi-
cation, if it existed, and certainly the instruction was as
liberal as the defendant could reasonably expect. The
fourth request is also embodied in the seventh instruc-
tion, but it is contended that since there was no claim at
the trial, nor charge in the indictment, that the killing
was effected in the commission of any felony, it was
error to include in the instruction the words, "unless the
killing was effected in the commission or attempt to com-
mit a felony." The court in this part of the instruction
quoted the language of the statute and there having
been no charge or claim that the killing was effected in
the commission or attempt to commit a felony, the jury
must have realized that they were instructed that the
proof of premeditation and deliberation, in addition to
the mere fact of killing, was required.

Defendant's counsel also contends that the court erred
in failing to give the following instructions requested by
the defendant: "7th. The deliberate use of a deadly

weapon by the defendant, and the fact that he killed the deceased with it, without further proof of deliberation and premeditation, is not sufficient to constitute murder in the first degree; therefore, if you should find that the defendant purposely and maliciously killed the deceased, by the deliberate use of a deadly weapon, but that there is no other proof of deliberation and premeditation than the fact of the killing, and the deliberate use of such weapon in killing her, or, if you entertain a reasonable doubt in this respect, you cannot find him guilty of murder in the first degree, but of murder in the second degree only." "10th. I further charge you that in order to find the defendant guilty of murder in the first degree, you must be satisfied beyond a reasonable doubt that he was in such a condition of mind as to be able to deliberate and premeditate; and you must be satisfied beyond a reasonable doubt, by evidence in addition to the mere fact of the killing of the deceased, and the deliberate use of a deadly weapon, that in so doing he did it of deliberate and premeditated malice, otherwise you cannot find him guilty of murder in the first degree." In the seventh instruction, the court charged the jury that there must be other evidence of malice than the mere proof of killing to constitute murder in the first degree, and fully covered these requests.

7. It is further contended that the court erred in failing to give the following instructions, requested by the defendant: "9th. I instruct you that in this case there is not sufficient proof of premeditation and deliberation, and therefore, you cannot, in any event, find defendant guilty of a higher crime than murder in the second degree." And that there was no evidence of malice, in addition to the mere fact of killing, to support the charge of murder in the first degree. The testimony shows that when the defendant returned from Astoria on

Sunday evening preceding his wife's death, he stated
that he did not have a nickel; that he was at home at
the time she was killed; that deceased kept her money
and valuable papers in a bureau, the keys to which prob-
ably were in the pocket of the dress she had on when she
was killed; that the pocket in this dress was partly
turned inside out when the body was first seen by others;
that the defendant took the keys from her pocket after
striking her with the club, and opened some of the
drawers of this bureau before he notified any one of her
death; that the person who first went to the house after
her death found the keys in the bureau; that this person,
who was a witness at the trial, had left his money with
the deceased and when he saw the keys in the bureau he
told the defendant that his money was lost; that the de-
fendant said to him: "You never lost a nickel; your
money is there all right"; that this witness and the de-
fendant then went to the drawer and looked for the wit-
ness' money but did not find it; that the witness went
away leaving the defendant in the room where the bureau
was and in a few minutes returned and found his money
among some clothing in the bureau; that the defendant
was present when the witness found the money, and that
when the defendant was put in jail on Thursday evening
the sheriff found fifty-two dollars on his person. This
evidence was in addition to the proof of killing, and it
was a question of fact for the jury to say by its verdict
whether from these circumstances an inference that the
defendant had deliberated and premeditated upon the
commission of the act before he struck the fatal blow
could reasonably be drawn, and hence there was no error
in refusing to give the instruction requested.

8.  Defendant's counsel contends further that the
first confession, made to the sheriff, in which he stated
that his wife, to whom he had been married thirty years,

and with whom he never had any difficulty; that she who had always treated him with affection should, without any provocation, throw a stone at him, is absurd, and the further statement therein that he was duly sober and in good humor when he killed her, conclusively shows that when he made this confession he was insane, and that the subsequent confession, made after he had recovered from the effects of the liquor, further confirms this conclusion. That the evidence of his habits, symptoms, and mental condition when recovering from a protracted drunken debauch, and the testimony of the medical experts show beyond a reasonable doubt that at the time the defendant struck the fatal blow he had not sufficient control of his mental faculties to premeditate and deliberate upon the atrocity of the act, and therefore was incapable of forming an intent to kill. Section 1358, Hill's Code, provides that "When the commission of the act charged as a crime is proven, and the defense sought to be established is the insanity of the defendant, the same must be proven beyond a reasonable doubt." This statute requires the accused, when insanity is plead as a defense, to establish the fact beyond a reasonable doubt. It is not in the province of courts to question the policy of the law or to say that the rule established in such cases is inhuman, or that the state should, in any contingency, be required to establish the fact of sanity like any other fact, beyond a reasonable doubt. From the facts and circumstances of the case, the jury were at liberty and it was their duty to say by their verdict whether the design to kill was formed and matured in cool blood, and not hastily upon the occasion, and having so found, under proper instructions from the court covering all the issues of the case, the judgment must be affirmed.

AFFIRMED.

## ON REHEARING.
[36 Pac. 296.]

Opinion by MR. JUSTICE MOORE.

The defendant, in his petition for a rehearing, contends that the state, having, as part of its case, introduced evidence of the defendant's mental condition, tending to raise an inference that he was, at the time of committing the act charged, incapable of forming a design, and this inference having been strengthened by the evidence for the defendant, that, therefore, the burden of proof was upon the state to establish the defendant's sanity beyond a reasonable doubt, and not upon the defendant to establish his insanity by the same degree of proof. In *State* v. *Hill*, 14 Southern R. 294, the supreme court of Louisiana held that, though the state had introduced evidence tending to show incapacity to form a design to kill, the defense was, nevertheless, special, and, like any other, must be proved by the party urging it, to the satisfaction of the jury, and that it was not the duty of the state to prove a negative by showing beyond a reasonable doubt that the defendant's state of intoxication was of a degree not to interfere with his judgment and intelligence, or preclude the possibility of his entertaining malice towards the deceased. In *State* v. *Coleman*, 27 La. Ann. 691, the following charge was held to be undoubtedly correct: "Drunkenness is no excuse for a crime, and any state of mind resulting from drunkenness, unless it be a permanent and continuous result, still leaves the person responsible for his acts." The court properly charged the jury that the defendant must have had sufficient mind to know that the contemplated act was wrong, and sufficient will power to refrain from its commission, and the jury, under proper instruc-

tions, having found against the defendant upon these questions, the petition for a rehearing must be denied.

AFFIRMED.