Decided at PENDLETON, 13 August, 1898.

## STATE v. BARTMESS.

[ 54 Pac. 167 ]

1. IMPEACHING ONE'S OWN WITNESS — EVIDENCE.— Where a witness gives testimony which is unexpected, the court may, in its discretion, permit the party calling him to direct the attention of the witness to circumstances of time, place, and persons present, to refresh his memory as to alleged contradictory statements; and where such witness answers in an equivocal manner, and seemingly tries to shade his testimony to the advantage of the other party, such statements made by him at another time may be given, not as substantive proof, but by way of explanation. *Langford* v. *Jones*, 18 Or. 308, and *State* v. *Steeves*, 29 Or. 85, followed.

2. IMPEACHING QUESTION — PERSONS PRESENT.— Where it is desired to lay a foundation for impeaching a witness by contradictory statements theretofore made, it is not necessary to name all the persons who were present. It will be sufficient to designate a few of them, especially where the contradictory statements were made in public, and then anyone who heard them may testify.

3. REFRESHING MEMORY FROM MEMORANDA — WITNESS. — Stenographic notes made at a preliminary examination may be used to refresh the memory of the person who made them to contradict the testimony of a witness, where a proper foundation therefor has been laid.

4. COMPETENT EVIDENCE OF SITUATION. — On a trial for murder evidence is admissible to the effect that the tracks of the deceased occurred at regular intervals to the point where he fell, although there were many tracks around the body, but none other in the furrow where the deceased was walking, as bearing on the question whether the deceased made any hostile advances on defendant.

5. DEFENDANT AS WITNESS — CROSS-EXAMINATION — IMPEACHMENT. — The defendant in a criminal action who voluntarily testifies in his own behalf may be cross-examined as to statements made on his preliminary examination contrary to his testimony on the trial, although he did not in his direct examination refer to the preliminary examination. *State* v. *Abrams*, 11 Or. 169, followed ; *State* v. *Lurch*, 12 Or. 99, and *State* v. *Saunders*, 14 Or. 300, distinguished.

6. APPEAL — UNANSWERED QUESTION.— Alleged error in excluding an answer to a question is not available on appeal unless the bill of exceptions shows that counsel stated what he expected the answer to be. *Stanley* v. *Smith*, 15 Or. 505 ; *State* v. *Gallo*, 18 Or. 423, and *Craft* v. *Dalles City*, 21 Or. 53, followed.

7. INSTRUCTIONS MUST BE TAKEN TOGETHER — TRIAL.— A judgment will not be reversed because some instruction considered alone may be subject to criticism where the instructions as a whole are substantially correct and could not have prejudicially misled the jury. *State* v. *Anderson*, 10 Or. 448, and *State* v. *Hansen*, 25 Or. 391, applied.

8. EVIDENCE OF THREATS—SELF-DEFENSE.—An instruction on a trial for murder that evidence of threats by the deceased or a previous quarrel may be considered by the jury if the circumstances raise a doubt as to whether defendant acted in self-defense in order to aid them in determining who was the aggressor is not prejudicial to defendant where he is convicted of manslaughter only, and if the jury had not considered such evidence the verdict must have been a finding that defendant was guilty of murder in the first or second degree.

9. FORCE TO EXPEL TRESPASSERS—HOMICIDE.—The right within a reasonable time to employ sufficient force to expel a person who unlawfully intrudes on one's premises after having been warned to depart does not extend beyond the limits of the dwelling and the customary outbuildings.

10. INSTRUCTION ON USE OF DEADLY WEAPON.—An instruction that "an intent to murder is conclusively presumed from the deliberate use of a deadly weapon, causing death within a year, if not done in self-defense or in the rightful and necessary defense of property," is cured by a modification to the effect that "this does not raise a presumption of murder in the first degree; it only uses the term 'murder,' and cannot raise a presumption greater than murder in the second degree." *State* v. *Carver*, 22 Or. 602, cited.

From Union : ROBERT EAKIN, Judge.

George W. Bartmess was convicted of manslaughter and appeals.

AFFIRMED.

For appellant there was a brief over the names of *Thos. H. Crawford, Baker & Baker* and *J. W. Knowles*, with an oral argument by *Messrs. Crawford* and *J. F. Baker*.

For the state there was a brief and an oral argument by *Messrs. Hugh F. Courtney*, district attorney, and *James A. Fee*.

MR. JUSTICE MOORE delivered the opinion.

George W. Bartmess was indicted for the crime of murder in the first degree, alleged to have been committed in the killing of one Henry Sidal, and, having been tried therefor, was convicted of manslaughter, and sentenced to imprisonment in the penitentiary for a term of ten years. From this judgment he appeals, assigning

as error the action of the trial court in admitting and rejecting testimony, and in giving and refusing certain instructions.

It is contended by defendant's counsel that the court erred in permittig the state to cross-examine its own witness, and attempt to impeach him upon an immaterial matter. To render the exception intelligible, it is deemed expedient to detail the circumstances which led up to the homicide : The testimony tends to show that defendant having leased to deceased and one Henry Ruhnstroth a tract of land for farming purposes, a controversy arose between him and them as to the right of possession of a garden; that on April 25, 1897, Sidal drove to the garden with a plow in his wagon and attempted to pass through a gate which Bartmess was trying to hold in position, so as to prevent him from entering and plowing the garden, but Sidal pushed the obstruction down, took the plow from the wagon and threw it on the gate over which he stepped and pursued Bartmess a short distance towards the latter's house, about one hundred yards off, to which he fled through an opening in the fence. Sidal thereupon hitched his team to the plow, and commencing at an opening in the fence near the southeast corner of the garden plowed once around the lot. In the meantime Bartmess, having obtained a Winchester rifle at the house, returned to a gate on the east side of the garden as Sidal was plowing the second furrow around the north end of the lot, and fired over his head. As Sidal reached the southeast corner of the garden, completing the second furrow, he was shot by Bartmess, the bullet entering the left side at a point above the hip, passing to the right and a little downward, severing the left common iliac artery and lodging in the fifth lumbar vertebra, from the effect of which he died in a very few minutes. The state insists

that he was instantly killed in his tracks as he followed
the plow, while Bartmess says he was shot as he was
approaching him in a threatening manner.    Bartmess
testified, in substance, that, after he fired the first shot
he passed through the garden gate and went towards the
southeast corner of the lot, towards which Sidal was
plowing ;  that as the latter reached the gap in the fence
he told him to drive out, and upon his refusal he
repeated the command, whereupon Sidal threw the lines
from his shoulder, passed around the horses and came
seven or eight feet towards him ;  that he twice told him
to stand back, but seeing him still approaching and fear-
ing that his life was in danger he, without taking aim,
fired the gun at a distance of twelve or thirteen feet from
Sidal, who, being hit, placed his hands to his side, went
backward about eleven feet, turned around and lay down.

1. Henry Ruhnstroth, a witness for the state, testified
that, when Sidal threw the plow on the gate, he followed
Bartmess several steps towards the latter's house ;  and,
the question being asked as to how many steps were
taken, he replied :  '' I couldn't say exactly ;  maybe three
or four, something like that.''    The attention of the wit-
ness having been called to the circumstances of time,
place and persons present, he was asked if he did not, at
Bartmess' preliminary examination, in answer to the
question, '' How far did Sidal run after Bartmess?'' say,
'' It was a couple of steps.''    Counsel for defendant ob-
jected to the question, for the reasons hereinafter stated ;
but the objection being overruled, and an exception al-
lowed, the witness answered :  '' Yes, I may have.    I
said either several or a couple ;  I don't know exactly.''
The witness was also asked if Bartmess ever told him
why he killed Sidal, to which he replied :  '' Well, when

33 OR.—8.

I first saw Bartmess, he said he shot him; that he wouldn't have done it, but he was afraid; he was coming towards him, and he told him he was going to kill him." The attention of the witness having again been called to the circumstances of time, place and persons present, he was asked if he had not said that Bartmess told him a number of times that he would not have killed Sidal for plowing in the garden if it were not that he had the quarrel at the gate. The same objection having been interposed as in the preceding preliminary question, counsel for the state informed the court that the testimony of the witness had taken them by surprise; whereupon the objection was overruled, an exception allowed, and the witness answered: "I guess I remember. I said I expect he never would have killed the man if it wasn't for the quarrel." The state, over defendant's objection and exception, called W. B. Sargent, who was not named as one of the persons present in the preliminary question propounded to Ruhnstroth, and one Hindman, who both testified that Ruhnstroth used the language as claimed by the prosecution. Counsel for the state, having called Ruhnstroth to the stand as a witness, thereby represented him as not wholly unworthy of credit, for which reason they could not attack his general reputation for veracity; but, having stated to the court that they had been surprised by his unexpected testimony, it was within the sound discretion of the court to permit them to call the attention of the witness to the circumstances of time, place, and persons present, in order that they might refresh his memory; but having answered in an equivocal manner, and seemingly tried to shade his testimony to defendant's advantage, no error was committed in allowing his contradictory statements, made at another time, to be offered in evidence, not as substantive proof, but by way of explanation only. Hill's Ann.

Laws, § 838; *Langford* v. *Jones*, 18 Or. 307 (22 Pac. 1064); *State* v. *Steeves*, 29 Or. 85 (43 Pac. 949) ; *Campbell* v. *State*, 23 Ala. 44 ; *People* v. *Jacobs*, 49 Cal. 384.

It is insisted that if Ruhnstroth testified at the preliminary examination that Sidal ran after Bartmess "a couple of steps," and at the trial that he followed him "several steps," or even "three or four steps," there is no material contradiction in the statements, and hence the court erred in admitting evidence of his former testimony. The defendant sought to excuse the homicide on the ground of self-defense, and, in support of his theory, tried to make it appear that, when he fired the fatal shot, he had reason to believe, and did believe, that deceased was about to take his life, or to inflict upon him some great bodily injury. The correct distance Sidal pursued Bartmess was therefore very material in tending to show the reasonableness of the latter's apprehension of violence, and also to illustrate the degree of the former's turbulence and vindictiveness. True, there is not much apparent difference between a "couple of steps" and a "few steps"; but the manner of stating these facts might be such as to impress the trial court that the witness intended to attach much more importance to the latter phrase than the use of the words employed would seem to indicate ; and, since the tone and bearing of a witness cannnot be incorporated into the bill of exceptions, the trial court was much better able to determine the question than this court can possibly be from an inspection of the record, in view of which we are not prepared to say that its discretion was abused in admitting the contradictory evidence objected to. It having been charged in the indictment that Bartmess purposely, and of deliberate and premeditated malice, killed Sidal, the defendant's plea of not guilty rendered material any evidence tending to prove that issue. If Bartmess said he

would not have killed Sidal for plowing in the garden if it were not that they had the quarrel at the gate, the declaration would have been against his interest, and evidence thereof would have tended to show premeditation and deliberation. The prosecuting attorney, expecting to be able to prove this admission by Ruhnstroth, called him to the stand, and requested him to state whether Bartmess ever told him why he killed Sidal, to which he replied : " Well, when I first saw Bartmess, he says he shot him. He wouldn't have done it but he was afraid. He was coming towards him, and he told him he was going to kill him." This testimony tended to prove defendant's theory of the homicide, and, having been produced by the state, was binding upon it, unless its effect could be avoided by stating to the court that a mistake had been made in calling the witness, in proof of which his attention was called to the circumstances of time, place, and persons present, and the statement which was imputed to him, detailed with particularity, in order that his memory might be refreshed ; and, upon inquiring if he made the statement, the witness replied : " I guess I remember. I said I expect he never would have killed the man if it wasn't for the quarrel." It will be observed that the witness qualifies the statement imputed to him by making it his own, instead of acknowledging that it was Bartmess' declaration ; and this being so, and the alleged admission being material, the mistake made in calling the witness was excused by producing other witnesses to prove that Ruhnstroth made, in their presence, the statement upon the faith of which the state relied.

2. It is insisted that, Sargent's name not having been included in the preliminary question propounded to Ruhnstroth, the court erred in permitting him to be called to

prove the statement claimed to have been made by the latter.   The testimony of a witness given at a trial, or at the preliminary examination of a person charged with the commission of a felony, cannot be regarded as a statement made to any particular individual; and, when the attention of the witness is directed to the circumstances of time, place and a few of the persons present, the opportunity to refresh the memory is afforded, in view of which any person present, though not named in the preliminary question except as "other persons," must be competent to detail the testimony given.   Before a witness can be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony, a foundation therefor must be laid, by calling his attention to the circumstances of time, place and persons present:   Hill's Ann. Laws, § 841.   It cannot be supposed that this statute is to be literally construed, or that a witness is entitled to a recital of the names of all persons present before evidence of his contradictory statements can be received; for, if that were the rule, an omission of a single name would render the testimony of any person so named inadmissible.   It is admitted that the person to whom the contradictory statement was made should be named in the preliminary question propounded for the purpose of laying a foundation for impeachment (*Sheppard* v. *Yocum*, 10 Or. 402); but the reason for this rule fails when the statement consists of testimony given at a preliminary examination, or at a public trial; and, such being the case, no error was committed in permitting Sargent to testify in relation to Ruhnstroth's evidence.

3. This witness took private stenographic notes of the testimony given at the preliminary examination, a part of which he transcribed and used at the trial, in order to

refresh his memory; and in answer to an interrogatory concerning the impeaching question propounded to Ruhnstroth, as to whether he had not said that Sidal ran after Bartmess a couple of steps, he replied: "I would say that the question wasn't asked in that particular shape. It is in substance the same. He did, according to the notes." Defendant's counsel thereupon moved to strike out his answer, because it was not the witness' recollection of what he said; but, the motion being denied, the witness added: "I said 'according to the notes,' but from my recollection he made that statement." While the minutes of the testimony given by a witness on a preliminary examination cannot be offered in evidence at the trial of the defendant to impeach such witness, because he did not sign the memorandum, the notes may, nevertheless, be used to refresh the memory of the person who made them, in order that he may contradict the testimony of the witness, if a proper foundation therefor has been laid: 29 Am. & Eng. Enc. Law (1st ed.), 792; *State* v. *Hayden*, 45 Iowa, 11; *State* v. *Adams*, 78 Iowa, 292 (43 N. W. 292); *Sanders* v. *State*, 105 Ala. 4 (16 South. 935). Sargent's memory having been refreshed by an examination of his notes, no error was committed in permitting him to testify in the manner indicated.

4. The state, claiming that Sidal was shot and fell in his tracks as he followed the plow, sought to establish its theory, and prove the degree of the homicide, by expert testimony tending to show that the wound inflicted must have produced instant death; that the location of the wound and the track of the bullet indicate the position which Bartmess must have occupied when he fired the shot; and that Sidal's tracks in the furrow occurred at regular intervals up to the point where he fell, thus showing, as it is claimed, that he could not have left the

plow to go around the horses, and hence made no hostile demonstrations towards Bartmess. The testimony of the state's witnesses tended to prove that Sidal's tracks could be traced to the point where he fell, the right foot remaining in its last imprint, while the last track of the left foot indicated that it had been dragged a short way, and that this foot was found to be drawn up under the body. It is contended by defendant's counsel that the evidence of other witnesses conclusively shows that all the witnesses for the state who testified concerning the condition of the ground immediately around the place where Sidal's body lay came to the scene long after the arrival of others who prior thereto had made so many tracks surrounding the body that it was impossible for the witnesses to identify Sidal's tracks ; and, such being the case, the court erred in permitting these witnesses, over objection and exception, to testify concerning the matter. The testimony of George Harmon, which is objected to for this reason, fairly illustrates the testimony of other witnesses, and shows that he saw dim tracks in the furrow leading up to where the body lay ; that there were a good many tracks leading from the body towards the garden gate, and many tracks around the head of the body, but he did not notice any tracks leading from the feet. If the testimony of this and other witnesses was to be believed, it tended to show that Sidal made the tracks in the furrow ; and, this being so, the court committed no error in admitting the testimony, and submitting the question to the jury for their determination.

5. The defendant, on direct examination in his own behalf, testified, in substance, that at the time of the difficulty at the gate, Sidal must have followed him about eight or ten feet ; that, as he shot, he thought he saw a whip, stick, or something fall from Sidal's hand ;

that, from Sidal's size and general appearance, his observation of him, his threats directly made or communicated to him, and his conduct at the gate, he believed him to be a violent and brutal man when in anger, and thought that, unless he shot the deceased, he would be killed by him ; and that, after he fired the fatal shot, Sidal went back about eleven feet.   On cross-examination he also said that Sidal followed him from the gate about twelve or thirteen feet, whereupon he was asked to state what he said at the preliminary examination as to how far he was followed, to which he replied : ''I don't just recollect what I said, exactly the distance.'' He was also asked if he had not there said, in the presence of certain persons, that Sidal chased him six or eight feet, to which he replied : '' I think it was further than that. I couldn't say positively.   I think I said about ten feet.'' The defendant was further cross-examined in relation to such distance, the menacing language and conduct of Sidal, his possession of a whip just before the shooting, the movements of both immediately after, and in regard to his testimony at the preliminary examination ; whereupon the state, after laying the usual foundation therefor, undertook to show by Sargent that the defendant made statements before the committing magistrate inconsistent with the testimony elicited on such cross-examination.   All this testimony having been admitted, subject to objection and exception, defendant's counsel contend that the pretended cross-examination of Bartmess did not relate and was not germane to any testimony given by him on his direct examination, in which he never alluded to the preliminary examination, or referred to any testimony given by him thereat ; and, such being the case, the prosecuting attorney was precluded from cross-examining the defendant in relation to any

testimony he may have given before the committing magistrate.

The organic law of the state declares that no person shall be compelled in any criminal prosecution to testify against himself:  Const. Or. art. I, § 12.    The statute, however, which permits a defendant in a criminal action to testify in his own behalf reads as follows :  "In the trial of or examination upon all indictments, complaints, information, and other proceedings before any court, magistrate, jury, grand jury, or other tribunal, against persons accused or charged with the commission of crimes or offenses, the person so charged or accused shall, at his own request, but not otherwise, be deemed a competent witness, the credit to be given to his testimony being left solely to the jury, under the instructions of the court, or to the discrimination of the magistrate, grand jury or other tribunal before which such testimony may be given ; *provided*, his waiver of said right shall not create any presumption against him ; that such defendant or accused when offering his testimony as a witness in his own behalf, shall be deemed to have given to the prosetion a right to cross-examination upon all facts to which he has testified, tending to his conviction or acquittal " : Hill's Ann. Laws, § 1365.

The views of this court on the latter clause of said section were clearly illustrated in *State* v. *Lurch*, 12 Or. 99, (6 Pac. 408), and *State* v. *Saunders*, 14 Or. 300, (12 Pac. 441), wherein the judgments were reversed because the trial court permitted the cross-examination of the defendant to extend beyond the facts testified to by him as a witness in his own behalf.    To the same effect, see *People* v. *O'Brien*, 66 Cal. 602, (6 Pac. 695).

But in *State* v. *Abrams*, 11 Or. 169, (8 Pac. 327), the defendant, being on trial for murder in the first degree, testified as to what occurred at the meeting which resulted

in the homicide.   Upon cross-examination, counsel for
the state, over his objection and exception, were per-
mitted to call his attention to the circumstances of time,
place and persons present; and he was asked if he had
not made, at other times, statements inconsistent with
the testimony given at the trial; but, the witness having
denied that he had made such declarations, other wit-
nesses were called, and permitted to testify to the effect
that he had made the statements imputed to him.   The
defendant, having been ·convicted, appealed; and the
court, in affirming the judgment, held that, when a de-·
fendant in a criminal action availed himself of the privi-
leges which the statute (section 1365, *supra*) conferred,
he subjected himself to the same rules of cross-examina-
tion as any other witness.   The question is whether the
rule announced in that case has been modified by the sub-
sequent decisions hereinbefore mentioned, in neither of
which is any reference made to the case of *State* v. *Abrams.*
Mr. Chief Justice LORD, in a concurring opinion, says,
in the case of *State* v. *Saunders,* 14 Or. 300 :   '' The gen-
eral rule in respect to any witness on cross-examination
is that he may be cross-examined as to any facts and cir-
cumstances testified to by him on his direct examination ;
and, personally, I have been inclined to think that our
statute was but a mere affirmation of this rule as to the
accused, and that, when he voluntarily took the witness
stand, he subjected himself to the same tests as are ap-
plied to any other witness, and, in the sound discretion
of the trial court, may be cross-examined as to collateral
facts calculated to test his credibility.   But the question
is debatable, and somewhat involved in doubt, and upon
which there is some diversity of judicial utterances ; and
in such case I feel constrained to resolve my doubts *in
favorem vitæ.*

And in *People* v. *Rozelle,* 78 Cal. 84, ( 20 Pac. 36,)

Mr. Justice WORKS, construing the California statute, and citing the case of *People* v. *O'Brien*, 66 Cal. 602, (6 Pac. 695) says : "The impression seems to prevail that the section quoted has the effect to confine the examination of a defendant to narrower limits than in the case of any other witness. We do not so understand it. He can only be cross-examined as to matters about which he was examined in chief. The rule is precisely the same as to any other witness. So far as other witnesses are concerned, however, the court is allowed some discretion as to the extent and scope of the cross-examination that might not be allowed in case of the defendant. But no such question arises here. It must be remembered, also, that the fact that a defendant offers himself as a witness as to a particular matter does not give the prosecution the right to make him a witness for the people, and examine him generally." To the same effect is the decision in the case of *State* v. *Porter*, 75 Mo. 171, under a similar statute, which is cited and relied upon by defendant's counsel. In *State* v. *Abrams*, 11 Or. 169 ( 8 Pac. 327 ) the language used is undoubtedly broader than is warranted by the cases of *State* v. *Lurch*, 12 Or. 99 ( 6 Pac. 408 ) and *State* v. *Saunders*, 14 Or. 300 ( 12 Pac. 441 ) which hold that a defendant in a criminal action cannot be cross-examined touching any other crimes he may have committed, unless he refers to such crimes in his direct examination, thus showing that he is not to be treated as a general witness to whom such questions may be propounded in the discretion of the trial court, for the purpose of testing his credibility. *State* v. *Bacon*, 13 Or. 143, ( 9 Pac. 333, 57 Am. Rep. 8 ).

The reason for this distinction is found in the fact that if the defendant could be treated as a general witness, and cross-examined as such, evidence of inculpatory acts tending to the commission of the crime with which he

was charged, and also of the commission of other crimes, might be brought before the jury, thereby causing them to lose sight of the real issue to be tried, and tending to the return of a verdict of guilty based upon evidence of particular acts wholly disconnected with the case on trial, in view of which the legislative assembly has wisely limited the rule of cross-examination, and confined it to the evidence given by the accused in his examination in chief. A fair construction of the statute in question leads us to conclude that defendant in a criminal action, having voluntarily testified in his own behalf, may be cross-examined in relation to all facts and matters germane to the testimony given by him on his examination in chief ( *State* v. *Gallo*, 18 Or. 423, 23 Pac. 264 ) ; but, if he has made at other times statements which are inconsistent with the testimony given by him at his trial, he may be impeached by proof of such contradictory statements in the manner prescribed by statute, and the conclusion reached in *State* v. *Abrams* is adhered to in this respect. The condition of the defendant's memory, however, while it may affect his credibility, does not tend to prejudice him in the minds of the jurors, who, as men, must know that sickness, accidents, age, and many other causes impair this faculty of the human mind; and as the statute was designed to eliminate from a criminal trial, so far as the defendant's testimony is concerned, all matters of prejudice only, the right to cross-examine him in relation to the condition of his memory is not limited or restricted. Applying these rules to the case at bar, we think no error was committed by the admission of the testimony complained of.

6. Bartmess, on direct examination, was asked to state what acts of violence or brutality, if any, he had seen Sidal commit shortly prior to the homicide. The court

having sustained an objection to the question, defendant's counsel excepted to the ruling, but did not state what was expected to be proved by the answer to this question. In *Kelly* v. *Highfield*, 15 Or. 277 (14 Pac. 744), it was held that to make such an exception available, the bill of exceptions must show that counsel stated to the court what was expected to be proved by the witness' answer. To the same effect see, also, *Stanley* v. *Smith*, 15 Or. 505 (16 Pac. 174); *Tucker* v. *Constable*, 16 Or. 407 (19 Pac. 13); *State* v. *Gallo*, 18 Or. 423 (23 Pac. 264); *Craft* v. *Dalles City*, 21 Or. 53 (27 Pac. 163). This rule of practice has become thoroughly settled in this state by repeated adjudications upon the subject, in view of which if any error was committed by the trial court it is not made available by the bill of exceptions.

7. The court having given the following instruction: (16) "If you find that Bartmess was rightfully in the possession of the garden, and went to where Sidal was plowing only for the purpose of peaceably removing Sidal, and without any intention of using force or doing violence to him in accomplishing that purpose, and, while defendant was so peaceably attempting to remove Sidal from the garden, Sidal did make an attack upon him by overt acts or demonstrations of violence, and that such attack by Sidal did cause defendant, as a reasonable man, to fear death or great bodily harm at the hands of Sidal, and that such danger was imminent, then defendant would be justified in shooting Sidal, if necessary to save his own life or his person from great bodily harm," — defendant's counsel excepted thereto, and now maintain that the language used limits the right of self-defense to the actual existence of imminent danger to life and limb, and that the court erred in failing to state that such right depended upon defendant's belief only in the

apparent existence of such danger, based upon facts existing at the time. In the seventh, eighth, and tenth instructions the court correctly stated to the jury the circumstances which would tend to superinduce such a mental condition as would excuse a person in taking the life of another. In *State* v. *Hansen,* 25 Or. 391 ( 35 Pac. 976, and 36 Pac. 296), it is said : " Whenever the instructions, considered as a whole, are substantially correct, and could not have misled the jury to the prejudice of the defendant, the judgment will not be reversed because some instruction, considered alone, may be subject to criticism." To the same effect, see, also, 2 Thomp. Trials, § 2314; *State* v. *Anderson,* 10 Or. 448; *Territory* v. *Hart,* 7 Mont. 489 ( 17 Pac. 718 ); *Territory* v. *Jaggers,* 9 Mont. 5 ( 22 Pac. 121); *People* v. *Doyell,* 48 Cal. 85; *People* v. *Welch,* 49 Cal. 174; *People* v. *Nelson,* 56 Cal. 77; *People* v. *Gray,* 61. Cal. 164 ( 44 Am. Rep. 549); *People* v. *Morine,* 61 Cal. 367; *People* v. *Hurtado,* 63 Cal. 288; *People* v. *McCurdy,* 68 Cal. 576 ( 10 Pac. 207 ); *People* v. *Kernaghan,* 72 Cal. 609 ( 14 Pac. 566 ); *People* v. *Clark,* 84 Cal. 573 ( 24 Pac. 313); *White* v. *Territory,* 1 Wash. St. 279 ( 24 Pac. 447). Tested by this rule, we think the court's charge, considered in its entirety, rendered the instruction complained of innocuous.

8. The court, referring to threats which it is claimed were made by deceased and communicated to defendant, and to the difficulty they had at the gate, also said to the jury : "And such threats or previous quarrel may be considered by you ( if you find there were such) in case the circumstances of the case raise a doubt in regard to whether defendant acted in self-defense for the purpose of aiding you in determining who was the aggressor in the affray." An exception having been taken

to this instruction, it is insisted by the defendant's coun-
sel that the effect of the language quoted is to change the
burden of proof, thereby compelling defendant to estab-
lish his innocence, instead of requiring the state to prove
its charge.    When a homicide is sought to be excused
on the ground of self-defense, evidence of threats made
by deceased towards, and communicated to, defendant,
and the latter's knowledge of his victim's dangerous and
desperate charater, are admissible as tending to prove
that deceased was the aggressor, and to measure the rea-
sonableness of defendant's apprehension of imminent
danger.    Whart. Cr. Ev. ( 9th ed.) § 757 ; *State* v. *Dod-
son*, 4 Or. 64 ; *State* v. *Porter*, 32 Or. 135 (49 Pac. 964) ;
*Pritchett* v. *State*, 58 Am. Dec. 250 ; *Campbell* v. *People*,
61 Am. Dec. 49, and valuable note ; *Keener* v. *State*, 63
Am. Dec. 269.  But if it conclusively appear from cir-
cumstantial evidence, or from the undisputed testimony
of witnesses to the killing, that defendant was the
attacking party towards whom the deceased made no
hostile demonstrations, evidence of threats made by the
latter, or of his bad character, can be of no avail to ex-
cuse the homicide, for the command, " Thou shalt not
kill," and the statutes which have been enacted to pro-
mote the divine injunction, serve to protect the life of a
bad as well as that of a good man.    Kerr, Hom. § 396 ;
2 Bish. New Cr. Proc. § 620 ; *People* v. *Garbutt,* 97 Am.
Dec. 162 ; *Payne* v. *State*, 60 Ala. 80 ; *Holly* v. *State*, 55
Miss. 424 ; *State* v. *Morey*, 25 Or. 241, (35 Pac. 655, and
36 Pac. 573).    The language used in the instruction com-
plained of was probably founded upon a remark of Mr.
Justice BLACK, in *State* v. *Downs*, 91 Mo. 19, ( 3 S. W.
219), in which he says :    "Where the killing has been
under such circumstances that there is doubt as to
whether the act was done from malice or from a sense of
real danger, testimony of the turbulent character of the

deceased may be received, and should be admitted, as tending to show and explain the motive that prompted the act."

It is the duty of the jury, in criminal actions, to resolve doubts in favor of the defendant, in view of which it must be admitted that the words adopted are not arranged in the best order to convey the court's idea of the law. Bartmess having testified that Sidal left the plow, and came towards him in a threatening attitude, rendered such testimony admissible, and its weight thereupon became a question for the jury to consider in connection with all the other evidence of the case; but, if they concluded therefrom that defendant was the aggressor, such evidence would be material only in aiding them to determine defendant's motive for the killing, and as a means for measuring the degree of his offense. The court, having admitted evidence of these threats and of the quarrel, told the jury, in effect, that it might be considered in connection with the circumstances of the case, such as the location of the wound, the track of the bullet, whether death was instantaneous, or deceased fell at the place he occupied when he was shot, etc., and that, if they were convinced beyond a reasonable doubt that defendant was the aggressor, the killing was inexcusable, in which case evidence of threats made by deceased, and communicated to defendant, and of their quarrel, would be unimportant in mitigation of the offense, and require no further consideration on that branch of the subject. It is very evident that the jury concluded that deceased was the aggressor, and hence considered the evidence in question. We are led to this conclusion from a consideration of the entire charge, and a belief that defendant was not prejudiced by the instruction complained of, for, had the jury failed to consider the evidence of such threats and quarrel, the verdict must inevitably have

been a finding that defendant was guilty of murder in the first or second degree.

9. It is contended that the court erred in refusing to give the following instructions requested by defendant: (3) " I instruct you that the defendant had a right to go out from the house to this garden, and order the deceased out of the garden ; and he had a right to take with him his gun if, in so doing, he acted in good faith, and took the gun thinking that this fact would cause the deceased to leave the garden more readily, or if he took the gun in good faith, for the purpose of protecting himself from being killed or receiving great bodily harm at the hands of the deceased ; and this is especially true if, from' the character of the deceased, the former threats made by the deceased, and communicated to him, and the conduct of the deceased at the barn shortly before that, led him, as a reasonable man, to believe that the deceased was liable to attack him and kill him or do him great bodily injury." (6) " I further instruct you that a man has a right to arm himself for the purpose of defending himself against a felonious attack liable to cause his death or do him great bodily harm, where, from the character of the assailant and his former attitude towards the defendant, his previous threats, communicated and made to the defendant, lead the defendant, as a reasonable man, to believe, and he does honestly believe, that his assailant is liable to attack him and kill him or do him great bodily harm if the opportunity occurs." A man's house is regarded as his castle, to which he may flee for safety and protection, and which affords him and his family a " city of refuge " ; and, if a person unlawfully intrude, the householder, after having warned him to depart, if he do not obey within a reasonable time,

33 OR.—9.

may employ sufficient force to expel him; but the immunity pertaining to the defense of a habitation does not extend beyond the limits of the dwelling and the customary outbuildings: *Lee* v. *State*, 92 Ala. 15 (25 Am. St. Rep. 17, 9 South. 407). The instructions requested seem to carry the right of repelling force beyond the limits of defendant's curtilage, and to imply that he might resort to the use of arms to settle a controversy in relation to the right of possession, and to rid his premises of an intruder; and, this being so, the instructions were properly refused when considered in the light of the sixteenth instruction given by the court, as hereinbefore quoted.

It is claimed that the court, in its charge, by the too frequent use of the phrase " and the defendant not being the aggressor," thereby seemed to emphasize and to call particular attention to this fact, to defendant's prejudice; but an examination of the charge convinces us there was no error in this respect.

It is also claimed that the court erred in refusing to give to the jury the seventh and eighth instructions requested by the defendant; but, without quoting them, it is sufficient to say that they were in effect given, as far as warranted by law, in the general charge, and hence no error was committed in refusing to repeat them.

10. It is contended that the court erred in instructing the jury that " an intent to murder is conclusively presumed from the deliberate use of a deadly weapon, causing death within a year, if not done in self-defense, or in the rightful and necessary defense of property"; but thereafter this instruction was modified, the court saying: " This does not raise a presumption of murder in the first degree; it only uses the term ' murder,' and cannot create a presumption greater than murder in the

second degree." So that any error of which defendant could complain was thereby corrected: *State* v. *Carver*, 22 Or. 602 (30 Pac. 315). And hence it follows that the judgment is affirmed.

Affirmed.

Argued 19 October; decided 22 November, 1897; rehearing denied.