Argued March 28, affirmed September 25, 1928.

## STATE v. JAMES H. GRAYSON.

(270 Pac. 404.)

For appellant there was a brief and oral argument by *Mr. W. A. Wiest.*

For respondent there was a brief over the names of *Mr. U. S. Balentine,* Deputy District Attorney, *Mr. W. M. Duncan,* District Attorney, and *Mr. H. M. Manning,* with an oral argument by *Mr. Balentine.*

McBRIDE, J.—The defendant is the father of Albert Grayson, who is the husband of Myrtle Grayson, and the evidence disclosed the fact that the defendant and Albert Grayson, his wife Myrtle Grayson and their children were living together on a ranch in California just over the Oregon line and that defendant had been so residing with Albert and his family for several years preceding the homicide. Malin, apparently the nearest village and trading town, is situated on the Oregon side of the state line a short distance from the residence of the Graysons. The evidence for the state indicates that the defendant was a man possessed of a hasty temper and that he had for some time conceived a dislike for the deceased; that he had made accusations to his son and other persons of the lewd association of the deceased

with a man named Sullivan and claimed that her sister Mabel Fogle was an intermediary between Mrs. Grayson and Sullivan, and he had frequently threatened the lives of all three. In fact, his conduct toward his son's wife was simply brutal and indefensible and his charges against her chastity were based upon such a flimsy foundation as to indicate a deep-seated and malicious hatred. At least there was such evidence, adduced by the state on the trial, which would justify the jury in coming to such conclusion.

The quarrels between the defendant and his son, and, to a great extent, between defendant and Mrs. Grayson, had attained such a pitch that the son Albert and his wife had determined to leave the joint residence and make their home elsewhere, and upon the evening in question were in the town of Malin, where Mrs. Mabel Fogle resided and had charge of a boarding-house where Sullivan boarded. Albert and his family attended a picture show that evening and later went to Mrs. Fogle's residence. Later Mrs. Grayson went out to the truck in which the family had come to town and had taken her place in it preparatory to leaving, the truck being parked on the same side of the street upon which Mrs. Fogle's residence and the telephone office in which she was employed was situated, and perhaps a few feet beyond the front of the telephone office.

■ About the time Mrs. Grayson got into the truck the defendant was observed standing on the opposite side of the street and Albert Grayson having previously been warned that defendant had a pistol on his person, and, no doubt in view of defendant's previous threats and actions, went to find an officer,

leaving Mrs. Grayson and the family in the truck and Mrs. Fogle standing by the side of the truck engaged in conversation with her sister, Mrs. Grayson, while Albert Grayson was away, and probably about the time of his return, Sullivan came out of the telephone office and upon the street near the two women and began talking to Mrs. Fogle and was immediately accosted by defendant, who advanced upon him with a drawn pistol, saying, among other things, "You d——d son-of-a-bitch, leave that woman [referring to Mrs. Grayson] alone." At this juncture Albert Grayson seized defendant's wrist and attempted to take the pistol from him while Sullivan seized defendant from behind and joined in the scuffle to disarm defendant. In the course of the melee Mrs. Grayson had gotten out of the truck and the pistol was fired, inflicting a wound upon her which subsequently caused her death. Defendant's threats against the life of Mrs. Grayson were sworn to by a number of witnesses and while denied by him are supported by such testimony as fully warranted the jury in concluding that the thought of taking her life in some contingency was firmly fixed in defendant's mind. For instance, he said to Ivan and E. H. Taylor that he was going to get Sullivan, Mabel Fogle and Mrs. Grayson all together and kill all three of them. To Mr. McMillan, a witness called by defendant, he said, that "if Albert Grayson did not keep his wife away from that damned whorehouse [meaning Mabel Fogle's residence] he was going to kill all three of them" [meaning Sullivan, Mabel Fogle and Mrs. Grayson]. And to F. R. Starr, defendant said: "I will separate Albert and her if I have to kill the God damned bitch to do it."

■ The critical question before the jury was whether the pistol was discharged accidentally in the course of the scuffle or purposely with the intent to kill either Sullivan, Albert Grayson or Myrtle Grayson in accordance with a preconceived design; for if, in attempting to shoot Albert Grayson or Sullivan, the shot went wild and killed Myrtle Grayson, the defendant would, if the other elements of the crime as they related to the two men were present, be just as guilty as if he had intended to shoot the woman.

■ There was evidence tending to show that the pistol was fired intentionally. Mrs. Fogle, who was close to the parties, testified that the electric lights were very bright and that she distinctly saw defendant press the trigger when the weapon was discharged. In this respect she was very positive, and it was for the jury to appraise the value of her testimony. Considerable time was taken up in discussing the position of the weapon when it was discharged, but we have the uncontradicted fact that the bullet entered the abdomen of the deceased and ranged upward and outward. In brief, the physical facts indicated that the pistol was pointed and discharged in the direction of Myrtle Grayson's body. Whether it was so pointed purposely was a question of fact for the jury and we are not permitted to intermeddle with their conclusion. So it appears that there was evidence sufficient to sustain the verdict rendered unless some material error in the proceedings renders the verdict void.

The defendant had able counsel and no stone was left unturned to take advantage of every ruling upon which his astute counsel could predicate even a technical error. As a result he has assigned twenty-two

alleged errors occurring on the trial and which we shall now consider in greater detail.

■ The first assignment predicates error on the ruling of the court admitting the statement of Albert Grayson as to a difficulty between defendant and Albert Grayson and his wife which occurred about three months before the homicide. The substance of the difficulty was that defendant became exasperated in the course of a quarrel with deceased and her husband and called deceased a dirty whore and other names and finally went across to the shack where he slept and returned with a pistol and renewed his abuse. This testimony was clearly admissible as showing defendant's state of mind in regard to deceased and her husband. Especially as it was followed up by proof of hostile declarations and threats both before and after 'that occasion and continuing down to within two weeks before the homicide when he made the threat to Smith to the effect that he would get "all three of them together and shoot them," or words substantially to that effect.

■ The second assignment relates to a quarrel between Albert and his father in regard to a bull, which took place immediately preceding the homicide, the particulars of which are not important, except that just before the quarrel Albert had seen his father's pistol in the shack, and after going to bring the bull back he found the pistol gone and his father away, and were brought in incidentally in the course of the testimony tending to show that defendant had armed himself before going to town. As there is no question as to his being armed that evening, and as to his drawing and leveling the pistol at Sullivan, it is waste of time to consider this assignment. There was no reversible error committed.

■ The next assignment is in regard to the ruling of the court limiting the cross-examination of Albert Grayson in regard to the tenseness of defendant's muscles during the scuffle. The examination on that subject had already proceeded to an unprofitable extent and the court did not err in concluding it.

The next assignment is predicated upon the alleged refusal of the court to permit counsel for defendant to cross-examine plaintiff's witnesses concerning the sanity or insanity of defendant. The only basis for this assignment is that in the testimony of E. H. Taylor, heretofore referred to, wherein he detailed a conversation with defendant, he testified that defendant told him that he was going to kill Sullivan, Mrs. Fogle and Myrtle Grayson the first time he caught them together.

The witness, E. H. Taylor, was cross-examined at length by defendant's counsel, and during the examination the following colloquy ensued:

"Q. How long have you known the defendant Mr. Grayson? A. Well I don't know just exactly; I have known him for ten years or more.

"Q. Had you seen him recently before you saw him on the occasion that you have related when he told you these things? A. Yes, sir; saw him once in awhile.

"Q. Were you right up close to him when he told these things to you and your brother Ivan? A. Yes, pretty close.

"Q. You heard every word he said, did you? A. I think I did.

"Q. Did you have occasion to look him in the eye? A. Well, no.

"Q. Did you observe the expression on his face when he stated those things? A. Well no, I don't know as I did; still on the other hand I did too, he

seemed to be mad and shaking when he told me that, like a man who was mad.

"Q. Have you seen him mad before? A. I don't know as I have.

"Q. Did you ever see him mad before that? A. Well, not that I recollect; yes, I did too.

"Q. Mad in the same way? Did he look just about like that? A. Mr. Shook had a little trouble on the lake over a cow.

"Q. Was he very mad then? A. Yes.

"Q. Not as mad as this time when he told you about these three people? A. Just about.

"Q. When he talked to you down here in front of Kalina's store, did he talk to you calm or visibly agitated? A. Well he talked just like a man who was mad.

"Q. Not very calm then? A. I would not think so, no.

"Q. Talk like a sane or insane man, in your judgment?"

Counsel for the state interposed an objection to the last question which was properly sustained.

The admission of the testimony of a nonexpert as to the sanity of a person is an exception to the rule in regard to opinion evidence, and in this state the conditions, under which such evidence can be admitted, is prescribed by subdivision 10 of Section 727, Or. L., which provides:

"The opinion of a subscribing witness to a writing, the validity of which is in dispute, respecting the mental sanity of the signer, and the opinion of an intimate acquaintance respecting the mental sanity of a person, the reason for the opinion being given."

A mere casual acquaintance with a person does not qualify a witness to speak as to his sanity. The acquaintance must be intimate and this must be the first thing shown. Secondly, the witness must

be asked to give his opinion as to the person's sanity, and third, he must be asked to give the reasons for his opinion. This course was not pursued here. The witness had testified that the defendant talked like he was "mad" evidently using that word in the sense of "very angry" and that he had seen him about as "mad" on another occasion when he had trouble with a neighbor over a cow. The witness was not asked to state his opinion as to defendant's sanity as derived from his previous acquaintance, but was asked whether defendant "talked like a sane or insane man on the particular occasion." Many a bad-tempered man talks like an insane man when under the influence of anger: *State* v. *Murray,* 11 Or. 413, 420 (5 Pac. 55). The admissibility of such testimony and the qualifications of the witness to express an opinion are matters largely in the discretion of the court and it was not abused in this instance.

■ The next assignment relates to the refusal of the court to permit counsel for defendant to interrogate the witness Albert Grayson as to whether there was "some movement on foot in the vicinity of Malin by some parties to get the defendant out of the way." As the question did not intimate that the witness was in any way concerned in such suggested move, it was clearly irrelevant and the objection was properly overruled.

■ ■ The next assignment of error is predicated upon the court's sustaining an objection to the question asked the witness Albert Grayson upon cross-examination as to whether or not he believed and wanted the court and jury to believe that the defendant killed the deceased deliberately and intentionally.

It is the province of a witness to detail facts and of the jury to draw its conclusions from those facts. The question put to the witness required him to give his opinion as to the legal effect of the facts charged. In effect, to state whether his father was guilty or not guilty of the crime for which he was being tried. The objection was properly sustained.

■ The next assignment relates to the refusal of the court to strike from the record the testimony of the state's witness Mabel Fogle to the effect that she would have hit the hand that held the gun but was afraid that she would hit the hand that held defendant's wrist and maybe cause it to be released so that defendant "could kill all of us."

The part of the answer last quoted was not relevant in a technical sense and should have been stricken out but we fail to see how it could have any possible effect on the jury.

■ Another objection is as to the court allowing the witness Albert Grayson to testify as to efforts of defendant to produce a separation between Albert and his wife. The testimony was admissible as tending to show the state of feeling existing in the mind of defendant upon the question of malice.

■ The next assignment relates to the refusal of the court to strike out the statement of Mrs. Fogle that when she last saw the defendant she thought he was still trying to shoot and would hit the deceased if he shot again "on account of her lying down." The language was technically improper but could have had no possible effect on the jury. It was evidently volunteered by the witness by way of explaining why she turned her attention from the scuffle to the condition of her sister.

■ The next assignment is in regard to the refusal of the court to permit counsel for defendant to ask witness Albert Grayson whether subsequent to the shooting he had not said, "that if Myrtle had remained in the truck she would not have been hurt." The question was clearly irrelevant, being merely an attempt to obtain the conclusion of the witness as to a particular state of facts. It seems very probable that if she had remained in the truck she would not have been shot but that defendant would have devoted his attention to those nearer at hand, so it may be said that if she had remained at home or in her sister's house she would not have been injured. The ruling was correct.

■ The next assignment is as to the ruling of the court refusing to allow the defendant to testify as to the trouble he had with his wife in Wisconsin fifteen years previous. It requires no discussion to show that such testimony was irrelevant.

■ The next assignment is as to the ruling of the court as to the probable direction of the bullet after it had passed through the body of Mrs. Grayson and had entered the telephone office and lodged in the opposite wall. The jury had all the data from the testimony of the physicians, the height at which it entered the window of the telephone office and the height at which it entered the opposite wall and they were just as capable of drawing deductions from these facts as the witness. Conceding for the purposes of this case that any investigation of the course of the bullet after it passed out of Mrs. Grayson's body was material, and the writer does not think it was, the jury had all the necessary data to make it.

■ The next assignment relates to the court's failure to charge the jury upon the question of insanity.

There was nothing in the testimony to indicate that the defendant was mentally unsound. On the contrary, his testimony indicates a normal mind entirely capable of discriminating between right and wrong and capable of knowing the wrongfulness and unlawfulness of any action he might commit. The case did not call for any instruction on that subject.

 The requested instruction was faulty in that it stated that the burden of proof of the sanity of defendant rested upon the state and further on stated that in the absence of any evidence in regard to the defendant's sanity he could be presumed to be sane. So framed, the instruction was contradictory and misleading. It also announced the "irresistible impulse" doctrine which has been expressly repudiated by the courts of this state. It also stated that if the jury entertained a reasonable doubt as to defendant's sanity, they should find him not guilty, while our statute requires that unless the jury is satisfied beyond a reasonable doubt of defendant's insanity, they cannot acquit him on that ground: Section 1527, Or. L.; *State* v. *Hansen*, 25 Or. 391 (35 Pac. 976, 36 Pac. 296).

The next assignment relates to the failure and refusal of the court to give defendant's requested instruction covering definitions of certain legal terms which definitions defendant's counsel allege to have been very material to a proper consideration of the case by the jury.

 The request contained at considerable length definitions of "malice," "deliberation," "premeditation" and the like, but so far as they pertain to this case these matters were sufficiently and more tersely defined by the court in its general charge, and the

defendant's case did not suffer by the failure of the court to instruct in the language requested by defendant's counsel.

Another objection is as to the refusal of the court to charge in regard to an alleged custom of carrying weapons in the vicinity where the homicide occurred. Such request was coupled with a further provision as follows:

"Now if you find from the testimony that such a general custom existed in the locality where this defendant resided, and if you also find from the evidence in this case that this defendant was carrying a firearm as a general custom of his, then the fact that he was armed on the day or night of the shooting in question, if you find that he was armed, must not be considered by you as necessarily indicating any ill will or evil design existing in the mind of the defendant."

There was no testimony that such a general custom existed, and even if it did, it was error to take from the jury the privilege of considering the intent of defendant in so arming himself on the evening of the homicide. The laws of this state prohibit anyone except certain officers from carrying concealed weapons and will not tolerate evidence of such a custom as an excuse for a violation of the statute. Had the defendant obeyed the precepts of good citizenship on the day of the homicide and left his pistol at home instead of arming himself with it, Myrtle Grayson would be alive to-day and her now motherless children would have the care and comfort that none but a mother can supply. A man living in a civilized community who habitually goes around with a deadly weapon tempts the devil to tempt him.

It is a cowardly practice which the law should neither countenance nor tolerate.

 Another assignment relates to the ruling of the court overruling defendant's motion for a new trial. The affidavits and other proceedings on this motion are not made part of the bill of exceptions or attached thereto or certified to by the judge and not technically a part of the transcript. Examining the motion and affidavits, however, we do not think the court abused its discretion in overruling the motion. It was in the discretion of the court to permit the jury to separate during recesses. The charge that the local press was hostile is merely a conclusion as not a single line of comment by the press is attached to the affidavit. Another ground for the motion is that one Starr, a witness for the state, on the second day of the trial at the noon recess and in the hearing of the jurors made statements highly derogatory to the defendant and refused to desist when cautioned not to indulge in such comments. This affidavit is made upon information and belief and so far as its legal effect is concerned is pure hearsay. No affidavit of any person professing to have heard Starr's comments is submitted. It is also contended that the case of defendant was prejudiced by reason of misquotations and misrepresentations by the counsel for the state. It does not appear that these alleged misrepresentations and misquotations of the testimony were objected to or called to the attention of the court at the time they were made nor any ruling asked at the time or exception taken. Under these circumstances we cannot take cognizance of them here. The trial was a long and tedious one and it is not surprising that an attorney would,

without intending to misrepresent, misquote some portion of it.

The writer, after having carefully read the testimony twice over and worked upon this case for a much longer period that it took the court and jury to try it in the court below, has frequently been compelled again to refer to the written transcript to be sure he was right. The judge and jury heard the testimony and there is no indication that either listened with a prejudiced ear. Much of the evidence in regard to the scuffle and the positions of the parties and the way the pistol was held in pantomime, the parties being required to stand before the jury and illustrate the action. This of course would not be put upon paper so that this court could have the whole scene before it. The circuit judge and jury who saw and heard the witnesses were in a position to know the facts.

The other exceptions are merely formal in character and to a great extent corollaries of the exceptions already noted and will not be considered here.

On the whole, while as in every case as lengthy as this may have been, no doubt there were minor mistakes committed, we find none which prejudiced any substantial right. The trial was fair and the result justified by the evidence, and the judgment is therefore affirmed. AFFIRMED.

RAND, C. J., and ROSSMAN and COSHOW, JJ., concur.