Argued June 15; affirmed June 29; petition for hearing denied
September 15, 1948

## STATE v. GRIECO
195 P. (2d) 183

*Harold B. Hutchinson* and *Dwight L. Schwab,* of Portland, argued the cause for appellant. With them on the brief were Cake, Jaureguy & Tooze, of Portland.

*John R. Collier,* Deputy District Attorney, of Portland, argued the cause for respondent. With him on the brief were John B. McCourt, District Attorney, and Dan M. Dibble, Deputy District Attorney, of Portland.

Before Rossman, Chief Justice, and Lusk, Belt, Kelly, Brand and Hay, Justices.

BELT, J.

Defendant was convicted of the crime of murder in the second degree, and appeals, assigning three errors, viz.: 1. Admitting in evidence a bloody knife with which the defendant stabbed his alleged wife to death. 2. Refusal to admit in evidence the testimony of an expert witness as to the alcoholic content of decedent's blood. 3. The instruction given requiring the defendant to prove his insanity beyond a reasonable doubt.

After a brief statement of the facts, these assignments of error will be considered in the order stated.

It is admitted by defendant that, on October 21, 1946, in Multnomah county, Oregon, he killed Frances Grieco by cutting and stabbing her with the hunting knife in question. The defendant, after due notice to the State, interposed the defense of insanity.

Defendant is a young man about twenty-four years of age. He enlisted in the United States Navy and was overseas in the World War about two years. After an honorable discharge from the Navy, he enlisted in the United States Army and was stationed at the time in question at Fort Lewis, Washington. On September 2, 1945, defendant—without knowledge of any previous marriage — married Frances Lindekugel at Boston. Massachusetts, who at that time appears to have been the wife of Lawrence A. Lindekugel. While defendant was at Fort Lewis, he made several week-end trips to Portland to visit his wife. Serious marital difficulties had arisen and each had accused the other of "stepping out." It is a sordid story of immorality, association with bad company, and over-indulgence in "booze," which we think will not adorn the pages of the reports. We will state only so much thereof as deemed necessary to comprehend the questions for decision.

On October 19, 1946, defendant bought the hunting knife in Tacoma, Washington, and then came on to Portland, Oregon, registering at a hotel. He left the knife in a dresser in his room and then went to St. Johns, near-by, where his wife was working at the Corona Cafe. His attempt to adjust their difficulties was unsuccessful. He met her again on Sunday afternoon and told her that she must either take him back and love him or get a divorce and return her engagement and wedding rings. On Monday, about 1:30 in

the morning, he saw her with a sailor on the street at St. Johns, at which time he asked her to return the rings. She thereupon made an engagement to meet him but never kept it. Defendant returned to his hotel in Portland and checked out. Later, on that same Monday morning, he went to the house where his wife was staying and, after knocking on the door and receiving no answer, went to a side window, cut the screen with his hunting knife, and went through the window into the room—with the knife in his hand—where he found his wife with a sailor. The parties on this rather dramatic occasion, after having a drink and smoking a cigarette, left the room and walked down the street together en route to the "Idle Hour" where all had beer. Defendant had handled the knife in a threatening manner, and his wife was crying and somewhat hysterical. After the parties finished drinking, decedent paid for the beer and gave the sailor two one-dollar bills, whereupon he departed.

The defendant on direct examination thus testified as to what occurred:

"Q All right, what did you do?

"A Then I knew, regardless of how much I loved her, there was only one thing to do, the one thing to do was to get a divorce and try to forget her.

"Q And what did you do?

"A I told her, 'Frances, are you ready to go ahead with the divorce?' and she turned around and stared at me. She was mad, and she said, 'I am not going to give you a divorce, or anything, and I will continue to make a sucker out of you. And I will still get your allotment checks, and I will call the police to have you picked up for breaking into my father's place,' and she got up and she said, 'I am going to call the cops,' and that is all I remember.

"Q What is the next thing you remember?

"A  I was away at the other end of the bar and my wife was on the floor.

\*   \*   \*   \*

"Q  Can you tell me the circumstances—can you tell me anything further?

"A  I felt awful hard all over my body, and there was a humming in my head as if I was going round and round, and I looked down and I saw the knife and I saw my wife lying there on the floor. The first thing, I didn't know whether to believe it or not. I couldn't believe seeing her dead and I wanted to forget it and I walked outside to get some air. I thought I was going to faint, and I looked for a police officer, and I walked back in again.

\*   \*   \*   \*

"Q  Did you see a police officer come in?

"A  Yes, sir.

"Q  What happened? What happened then?

"A  I told him, 'There is the knife, and I am glad I did it.'

"Q  How did you know that you did it?

"A  I didn't know I did it.

"Q  Why did you tell him that?

"A  I don't know why I told him that.

\*   \*   \*   \*

"Q  How do you know it was your wife that was there, Joe?

"A  I don't know.

"Q  Why did you say it was?

"A  I don't know why I said it."

There is evidence from other witnesses that while the defendant and his wife were seated at the counter, she suddenly screamed and ran behind the bar; that the defendant chased her with the hunting knife in his hand and, after catching her, stabbed her at least twice; that she broke away from him, and he followed her and continued stabbing her until she fell to the floor. In all, there were eight wounds in her body.

■ Defendant contends that it was error to admit the knife in evidence in view of his admission that he "wielded the knife that killed this woman and that she died as a result of the wounds inflicted by him at the Idle Hour." Defendant asserts that the admission of this gruesome exhibit only served "to inflame the minds of the jurors," particularly in view of the fact that it was stained with blood. Assuming that the knife was a gruesome exhibit, it would not by reason thereof be inadmissible, if it tended to prove a material issue in the case. *State v. Cunningham,* 173 Or. 25, 144 P. (2d) 303; *State v. Nelson,* 162 Or. 430, 92 P. (2d) 182; *State v. Weston,* 155 Or. 556, 64 P. (2d) 536, 108 A. L. R. 1402, wherein *State v. Miller,* 43 Or. 325, 74 P. 658— relied upon by defendant—is "distinguished" and the rule therein announced is no longer controlling. As stated in 2 Wharton, Criminal Evidence (11th ed.) § 759:

> "Where a homicide or other crime of violence is committed with the use of a weapon, such weapon * * * is admissible as tending to prove the commission of the crime charged." Citing numerous authorities in support of the text.

Had no admission of the defendant been made, it is clear that this knife—an instrumentality of the crime charged—would have been admissible. It does not follow that because the admission was made that such evidence would, by reason thereof, be rendered inadmissible. Notwithstanding the admission by the defendant of the use of the knife, the trial court did not abuse its discretion in permitting the State to present its case in such manner as would better enable the jury to consider and weigh all the facts and circumstances of the case.

■ Did the court err in refusing to admit evidence relative to the alcoholic content of the decedent's blood? The State introduced evidence as a part of the res gestae that decedent was crying and in a highly nervous condition immediately prior to the time of the killing. Defendant asserts that since the jury might have drawn the inference from such evidence that her condition was due to threats made by the defendant that he would have the right to show that she thus acted because of intoxication. Defendant never claimed that decedent was intoxicated, although some beer admittedly had been drunk. Furthermore, defendant admitted that he had made threats against decedent and that he purchased the knife for the purpose of scaring her. In any view of the matter, we are unable to see wherein the alcoholic content of decedent's blood would tend to show the mental capacity of the defendant. If defendant was not insane, he was guilty of murder in view of his admission of the use of a deadly weapon, for he would be presumed to have intended the natural consequences of his act. Defendant does not contend—and there is no evidence tending to show—that he accidentally killed his wife or that he killed her in self-defense. The court did not err in rejecting this evidence. Certainly, if it was error—and we think it was not—defendant was not prejudiced thereby.

The jury, as evidenced by its verdict, did not believe that the defendant was insane. Defendant assigns error because the court, in keeping with the statute (§ 26-929, O. C. L. A.) instructed the jury that the defendant was required to prove his insanity beyond a reasonable doubt. The challenged instruction is as follows:

"The law presumes every man to be sane until he establishes in the minds of the jury beyond a reasonable doubt the fact of his insanity. In other

words, the burden is upon the party claiming insanity as a defense to make out that defense beyond a reasonable doubt, and if you have any reasonable doubt as to whether the defendant, at the time of the commission of the alleged homicide, if he did commit it, was sane or insane, the State is entitled to the benefit of such doubt, and you should reject such defense.''

To this instruction counsel for defendant thus excepted:

" * * * it takes away from the defendant his presumption of innocence and requires him to prove his innocence beyond a reasonable doubt, and, furthermore, it is a violation of the Constitution, and deprives the defendant of his due process.''

Section 26-929, O. C. L. A., in so far as is material herein, provides:

''When the commission of the act charged as a crime is proven, and the defense sought to be established is the insanity of the defendant, the same must be proven beyond a reasonable doubt * * * *.''

This statute was enacted in 1864 and has never been amended. It is reasonable to assume that the legislature in thus placing the burden of proof on the defendant intended to protect the public against persons who seek to avoid responsibility for their criminal acts by pretending insanity — aided and abetted by expert alienists. Certainly this legislative enactment, although an extreme one, has a reasonable relation to the end sought to be attained.

In *State v. Wallace,* 170 Or. 60, 131 P. (2d) 222, the court in commenting on the burden of proof where the defense of insanity is interposed—although the precise question at bar was not involved—said:

''Approximately one-half of the states of the union have adopted the rule that the burden of

proof is on the state to prove the defendant sufficiently sane to be held responsible. Weihofen (supra), pages 150 and 172. In such jurisdictions, the state can rely only on the presumption of sanity as perhaps relieving it of the affirmative duty of introducing evidence of sanity in the first instance. In such states, it might be suggested that any substantial evidence of irrational conduct would be sufficient to sweep aside the tenuous presumption of sanity and impose upon the court the burden of instructing on that issue. 22 C. J. S. page 889, § 576. Decisions from states where such rules prevail are of little or no aid in this jurisdiction, for Oregon is one of the twenty-two states which have adopted the rule that the burden of proof of insanity as a defense is upon the defendant, under which insanity becomes an affirmative defense. Weihofen (supra), p. 148. Not only is the burden of proof of insanity upon the defendant, but Oregon is the only state in the Union in which that affirmative defense must be proved by the defendant beyond reasonable doubt. State v. Hansen, 25 Or. 391, 35 P. 976, 36 P. 296; State v. Riley, 147 Or. 89, 30 P. (2d) 1041. It is not for this court to nullify that rule, as it is established by valid legislative enactment. (O. C. L. A. 26-929.)''

In the absence of a controlling statute, there are three lines of authorities relative to the burden of proof where the defense of insanity is interposed: 1. In a few jurisdictions the burden rests upon the defendant to establish his insanity beyond a reasonable doubt. 2. The burden is upon the defendant to establish his insanity by a preponderance of the evidence. 3. If there is a reasonable doubt as to the sanity of the defendant, he must be acquitted. The last rule is adopted by courts of high repute in several states and by the United States Supreme Court. 2 Wharton, Criminal Evidence (11th ed.) §§ 896, 897, 898. See Weihofen,

Insanity as a Defense in Criminal Law, page 172, where the courts in various jurisdictions are classified relative to the question as to the burden of proof when insanity is claimed as a defense.

■ In view of the controlling statute in this state (§ 26-929, O. C. L. A.) we deem it unnecessary to consider the divergence of opinion among courts in other jurisdictions as to where such burden of proof should in logic and reason rest. The sole question here involved is whether it was within the power of the legislature to place upon a defendant accused of a crime the burden of establishing his insanity beyond a reasonable doubt. Does the statute so deprive the defendant of the benefit of the presumption of innocence that it may be said that he has been convicted without due process? It is not for this court to invade the province of the legislature and to determine which of the various theories supported by judges or law writers is the most logical and reasonable. The strong argument of counsel for defendant on this phase of the case would be more appropriately addressed to the legislature. As stated in *State v. Hansen,* 25 Or. 391, 35 P. 976, 36 P. 296, referring to the statutory rule in this state relative to the burden of proof:

"It is not in the province of the courts to question the policy of the law or to say that the rule established in such cases is inhuman, or that the state should, in any contingency, be required to establish the fact of sanity like any other fact, beyond a reasonable doubt."

■ No case has been cited—and none has been found—wherein it was held that such a legislative enactment was unconstitutional. Beginning with *State v. Murray,* 11 Or. 414, 5 P. 55—a decision rendered in

1883—this court has repeatedly and consistently approved instructions relative to the burden of proof in keeping with the statute. *State v. Wallace,* supra; *State v. Riley,* 147 Or. 89, 30 P. (2d) 1041; *State v. Grayson,* 126 Or. 560, 270 P. 404; *State v. Brumfield,* 104 Or. 506, 209 P. 120. The constitutionality of the Act has never, until now, been challenged. We agree that counsel are not, by reason thereof, precluded from questioning the validity of the statute, but it is submitted that after a rule has been so well settled, a court should, indeed, be reluctant to disturb it.

*State v. Kline,* 50 Or. 426, 93 P. 237, involved the crime of selling and giving away intoxicating liquors. The statute at that time cast upon the defendant, charged with violating the local option enactment, the burden of overcoming the prima facie case of validity of the prohibition order of the county court. The court, in sustaining the conviction, said:

"The rule which imposes upon a defendant the burden of proof in a prosecution for a statutory crime, does not violate any vested right which he possesses."

■ The presumption of innocence is one of the strongest known to the law, but it must be considered in the light of other conflicting presumptions. As said on rehearing in *State v. Butchek,* 121 Or. 141, 253 P. 367, 254 P. 805:

"The trial begins with the presumption of the defendant's innocence; but, upon the proof of the commission of an unlawful act, the presumption is that such act 'was done with an unlawful intent,' and that the perpetrator 'intends the ordinary consequences of his voluntary act.' Or. L., § 799, subds. 1-3."

In *Morrison v. California*, 291 U. S. 82, 78 L. E. 664, 54 Sup. Ct. 281, it is said:

"The decisions are manifold that within limits of reason and fairness the burden of proof may be lifted from the state in criminal prosecutions and cast on a defendant. The limits are in substance these, that the state shall have proved enough to make it just for the defendant to be required to repel what has been proved with excuse or explanation, or at least that upon a balancing of convenience or of the opportunities for knowledge the shifting of the burden will be found to be an aid to the accuser without subjecting the accused to hardship or oppression. Cf. Wigmore, Evidence, Vol. 5, §§ 2486, 2512 and cases cited."

In *Louisville and Nashville Railroad v. Schmidt*, 177 U. S. 230, 44 L. E. 747, 20 Sup. Ct. 620, the court said:

"It is no longer open to contention that the due process clause of the Fourteen Amendment to the Constitution of the United States does not control mere forms of procedure in state courts or regulate practice therein."

Defendant relies on *Davis v. United States*, 160 U. S. 469, 40 L. E. 499, 16 Sup. Ct. 353, but we think the case is not in point, although it is, indeed, a strong argument for the change of the statutory rule in this state. Davis was convicted of having committed a murder in "Indian Territory" in the state of Arkansas. The judgment of conviction was reversed because of an instruction requiring the defendant to establish his insanity to the "satisfaction of the jury." The court held—in keeping with the Federal rule—that if defendant created a reasonable doubt as to his sanity, he must be acquitted. The court did not have under consideration any statute placing the burden of proof

on the defendant. Neither was it considering any constitutional question. After reviewing the authorities the court significantly stated:

"The views we have expressed are supported by many adjudications that are entitled to high respect. If such were not the fact, we might have felt obliged to accept the general doctrine announced in some of the above cases; for it is desirable that there be uniformity of rule in the administration of the criminal law in governments whose constitutions equally recognize the fundamental principles that are deemed essential for the protection of life and liberty."

There was no intimation that the rule followed in some jurisdictions was unconstitutional.

■ Defendant also cites *State v. Strasburg,* 60 Wash. 106, 110 P. 1020, 32 L. R. A. N. S. 1216, wherein the court properly held an act unconstitutional, as depriving the accused of due process, which provided that insanity is no defense to a charge of crime. Clearly it is not in point. A legislative enactment depriving an accused of the defense of insanity is far different from one which makes it incumbent upon him to overcome a presumption of sanity.

The judgment is affirmed.