Argued October 3, reversed and remanded December 19, 1950

# STATE OF OREGON *v.* GARVER

225 P. (2d) 771

*Claude M. Johns, Jr.,* of Portland, argued the cause for appellant. With him on the brief was Henry A. Buehner, of Portland.

*J. Raymond Carskadon* and *Charles E. Raymond,* Deputy District Attorneys for Multnomah County, of Portland, argued the cause for respondent. With them on the brief was John B. McCourt, District Attorney for Multnomah County, of Portland.

Before LUSK, C. J., and BRAND, ROSSMAN, HAY, LATOURETTE and WARNER, Justices.

LUSK, C. J.

The defendant, Robert Edgar Garver, has appealed from a conviction of first degree murder. The jury, by its verdict, did not recommend life imprisonment, and the death penalty followed as a matter of course.

The indictment charged Garver and two others, Norman Carroll Andrus and Leland Delbert Marshall,

with shooting and killing one Ancell Abbott in the course of an attempt to commit the crime of assault and robbery being armed with a dangerous weapon.

The proof showed that on the early evening of January 3, 1949, Garver, then twenty-four years of age, met his accomplices in a tavern in downtown Portland, and proposed to them that they rob Abbott, who was a janitor in the Fred Meyer Store located at Fourth Avenue and Morrison Street. Garver claimed to have information that Abbott would be leaving the store late in the evening carrying about $5,000.00 in a shopping bag. Acting upon Garver's suggestions, the other two stole an automobile, secured two guns, and rejoined Garver at about nine o'clock in the evening in the vicinity of the store. Garver armed himself with one of the guns, a .32 automatic pistol. They waited until Abbott appeared carrying the shopping bag, and followed him several blocks in the stolen automobile to Tenth Avenue and Alder Street, where they parked the car in a parking lot. Andrus, the driver, remained in the car while the other two got out and held up Abbott with guns in hand. The defendant Garver shot Abbott three times, and the three desperadoes fled in the automobile, taking with them the victim's shopping bag, which, as it turned out, contained no money but only some clothes. As they sped away from the scene of the crime, Garver said, according to Marshall's testimony, "he had to shoot the fellow, he started to fumble for a gun." In fact, Abbott was not armed. He died of the gunshot wounds.

■ In bare outline that is the story of the commission of the crime. It occurred on a brightly lighted street at about the hour of ten o'clock at night, and was witnessed by several persons who testified to what they

saw. Marshall and Andrus pleaded guilty and were witnesses for the state. There is a suggestion in the defendant's brief that the testimony of these accomplices was not sufficiently corroborated, but there was no motion for a directed verdict and no assignment of error based upon such a claim. Nevertheless, we have examined with care the entire transcript, which contains 953 pages of testimony, and find that, without the evidence of the accomplices, the crime and the defendant's part in it were established by uncontradicted evidence which fully warranted submission of the case to the jury.

The actual substantial controversy arises out of the defense of insanity.

■■ It is contended that the court erred in instructing the jury that, in determining whether this defense had been established, they should be guided by the so-called right or wrong test. The question was raised on the trial by requests for instructions and exceptions to instructions given. The instructions given are almost word for word identical with those which this court in *State v. Brumfield,* 104 Or. 506, 537, 209 P. 120, approved as covering "all phases of insanity as a defense and of the evidence necessary to establish it", and included the following:

"Insanity, to excuse crime, must be such a disease of the mind as dethrones reason and renders the person incapable of understanding the nature, quality and consequences of his act, or of distinguishing between right and wrong in relation to such act. It is not every eccentricity of mind, however well-established, that will excuse the commission of an act otherwise criminal.

"A morbid propensity or inclination to commit prohibited acts, existing in the mind of a person

who.is not shown to have been incapable of knowing the wrongfulness of such acts, forms no defense to the prosecution therefor. The test of criminal responsibility is the power to discriminate between right and wrong."

■ These instructions conform to the law as laid down by this court in numerous cases, among which are *State v. Layton,* 174 Or. 217, 226, 148 P. 2d 522; *State v. Wallace,* 170 Or. 60, 79, 131 P. 2d 222; *State v. Riley,* 147 Or. 89, 99, 30 P. 2d 1041; *State v. Grayson,* 126 Or. 560, 575, 270 P. 404; *State v. Hassing,* 60 Or. 81, 86, 118 P. 195. The defendant freely recognizes this, but insists that the doctrine of our decisions .should be abandoned in favor of what is claimed to be the modern and more enlightened and civilized rule, applied in many courts, which includes irresistible impulse within the definition of insanity as a defense to crime. This contention has been repeatedly urged upon this court and as often rejected, both on grounds of general law and because of the legislative command of § 23-122, which reads: "A morbid propensity to commit prohibited acts, existing in the mind of a person, who is not shown to have been incapable of knowing the wrongfulness of such acts, forms no defense to a prosecution therefor." As indicated in *State v. Wallace,* supra, and *State v. Hassing,* supra, this statute ties the hands of the court and prevents it from liberalizing the rules governing the insanity defense, even though the court should be of the opinion that those rules do not take sufficient account of the discoveries of modern medical science. We are unable, therefore, to sustain this assignment of error.

The most serious question in the case is presented by the defendant's contention that the court erred in

refusing to give to the jury in its charge the following instruction requested by the defendant:

> "I instruct you that the law presumes that insanity having once been shown to exist continues until the contrary is made to appear. In other words, a person who has been adjudicated insane is to be deemed to continue in such a mental state until such a time as evidence of his sanity is introduced."

It appears from the evidence that the defendant was born on August 24, 1925. He had a record of juvenile delinquency, commencing at about the age of 10. He was in the Army during World War II, and was honorably discharged on May 5, 1943, for disability, upon the basis of a diagnosis made when he was admitted into Barnes General Hospital, Vancouver, Washington, on March 27, 1943, as follows: "Psychoneurosis, conversion hysteria, severe, manifested by complete amnesia of 19 days duration, cause undetermined."

In September, 1945, the defendant was held in the Multnomah County jail on a burglary charge. With eleven other prisoners he broke jail. He was later indicted and entered a plea of not guilty on the ground of insanity. He waived his right to a trial by jury, and, on October 29, 1945, after a trial before the court, he was found not guilty on the ground of insanity, the order reciting that he was unable to appreciate the consequences of his act, that he was insane both at the time of its commission and at the time of the trial, and unable to participate and assist in the conduct of his defense.

On November 7, 1945, he was admitted to the Veterans' Hospital at Roseburg, Oregon, which is maintained principally for the care of nervous and

mental diseases. A diagnosis, "Without psychosis; psychopathic personality with asocial trends", was made. On December 17, 1945, he was granted leave of absence from the hospital in custody of his mother. This was changed to a ninety-day trial visit, at the expiration of which, on March 17, 1946, he was discharged. The hospital record recites: "No communications have been received from the veteran, and it is presumed that he is adjusting well outside the hospital."

The presumption proved to be ill-founded, as on March 18, 1946, the day after his discharge from the Roseburg hospital, the defendant was committed by the county judge of Coos County to the Oregon State Hospital as a mentally diseased person. This action followed his arrest for attempted burglary in a bus station in Coos Bay. He was admitted to the State Hospital on March 20, 1946. A provisional diagnosis of "psychoneurosis hysteria" was made. On April 2, 1946, he escaped, and on April 3 was given the status of parolee in care of his mother. In May, 1948, while still paroled to his mother, he was in jail in Clark County, Washington, and, at his mother's request, was there examined by Dr. Gerhard B. Haugen, a psychiatrist. In the report of his examination made to the district attorney of Clark County under date of June 3, 1948, Dr. Haugen, after stating, on the basis of what he considered reliable history, that "The basic pattern present is that of a Psychopathic Inferiority", concluded: "He is not fit to be at large either from the standpoint of the protection of society or for his own safety." Dr. Haugen made the following, among other, suggestions: "In view of the fact that there is a strong possibility that this man is at this time psychotic and does not clearly know right from wrong, a

period of observation in a hospital equipped to handle mentally ill persons would aid in clearing up this question.'' ''Inasmuch as in his previous hospitalization the sympathies of his family have prompted them to obtain his release, it would seem advisable that the court maintain, if possible, some sort of custody over him to prevent his premature return into free society.'' Apparently Dr. Haugen was not aware that at that time Garver was a parolee from the State Hospital. He was never discharged from that institution, and the parole status was in effect at the time of the commission of the crime of which he stands convicted on January 3, 1949.

As bearing on his mental condition, there is the history of a head injury received by the defendant in November, 1940, when an automobile in which the defendant was a passenger left the highway and plunged 160 feet down an embankment. The state, however, introduced evidence tending to show that he was not seriously injured in this accident.

Dr. Haugen, as a witness for the defendant, gave it as his opinion, based on an examination made the day before he testified, that if the defendant were observed in an institution for a period of two or three months a diagnosis of psychomotor epilepsy would be established. A person so afflicted, he said, sometimes loses consciousness for periods of hours or even days ''while continuing the activity which, to a person who didn't know him well, might not seem to be out of the way.'' The afflicted person then has no knowledge of what he is doing. The disease may be treated with medication, Dr. Haugen testified, and, so long as the patient continues with the medicine, he carries on just as well as a diabetic using insulin.

In addition to the foregoing there was lay testimony of the defendant's mother and others tending to show the defendant's chronic condition of mental abnormality.

The expert testimony on behalf of the state was devoted largely to proving that the defendant was not legally insane at the time of the homicide; there was no attempt to show that during any of the times covered by the testimony which we have recited the defendant was not suffering from some form of mental malady.

It is in the light of this evidence that the present contention must be considered.

The question whether there is a legal presumption that insanity continues has been before the courts of this country many times. As stated in Weihofen's "Insanity as a Defense in Criminal Law", p. 164:

> "The courts of a score or more of jurisdictions have said that when permanent, chronic, or continuous insanity is once proved to have existed at some time prior to the alleged crime, it will be presumed to have continued, and to have existed at the time of the alleged crime, unless the contrary is proved. This presumption arises especially upon proof of a prior adjudication of insanity, by proceedings *de lunatico inquirendo,* etc., but the cases do not seem to limit the rule to such proof; the presumption seems to hold, by whatever evidence the prior insanity may be proved.
>
> "However, no such presumption arises from proof of a prior insane condition which was merely temporary in character. Delirium tremens, or other mental derangement immediately resulting from the use of intoxicating liquor, is therefore not presumed to continue."

■ We have examined the cases cited in the note to the foregoing text (as well as many others) and find

that they support the author's statement. This court has twice in civil cases held that there is such a presumption. *Johnson v. Johnson,* 124 Or. 480, 264 P. 842, was an adoption proceeding. The case turned on the question whether the mother of the child, who opposed the petition for adoption, was insane. She had previously been so adjudged, committed to the State Hospital, and, after a period of confinement there, discharged. The court held that, in view of the presumption that insanity once established continues until it is overcome by proof to the contrary, the burden was upon the mother to establish her sanity. In *In re Dugan,* 158 Or. 439, 76 P. 2d 961, the question was whether Dugan was an insane person for whom a guardian should be appointed. He had previously been adjudicated insane and committed to the State Hospital. The court said:

"* * * It is well-established that an adjudication of insanity is conclusive evidence of such mental status at the time the same was made. It is also well settled that the law presumes that insanity, having once been shown to exist, continues until the contrary is made to appear." (158 Or. 442)

See, to the same effect, the specially concurring opinion of Belt, J., in *Wenker v. Landon,* 161 Or. 265, 279, 88 P. 2d 971.

Our decisions are in accord with what our research convinces us is the decided weight of authority on this question, although they have failed to mark the distinction between temporary and chronic types of insanity. The presumption is a disputable one, founded in the statutory provision in § 2-407 (33), O. C. L. A., that "a thing once proved to exist continues as long as is usual with things of that nature". Obviously, it would be difficult to attach the probability of continu-

ance to mere temporary insanity, such, for example, as delirium tremens. There are authorities to the contrary, notably, among the text writers, Professor Wharton, who criticizes the presumption as a "mere *petitio principii*, it being tantamount to saying that chronic insanity is chronic, and transient insanity is transient". He maintains that the presumption is one of fact varying with the particular case. 2 Wharton on Evidence (2d ed.), 388, § 1253. To the same effect see Underhill's Criminal Evidence (4th ed.) 595, § 303; *State v. Austin,* 71 Oh. St. 317, 73 N. E. 218; *Leache v. State,* 22 Tex. App. 279, 312, 3 S. W. 539, 58 Am. Rep. 638. Greenleaf has also been cited by some courts in support of this view, but we think without justification, as Greenleaf treated the presumption of continuing insanity as a presumption of law. It is apparent that reliance has been placed on the bracketed sentence inserted by Professor Redfield at the end of § 42 in Vol. 1 of the Twelfth Edition of Greenleaf on Evidence. The sentence reads: "But those presumptions [of continuing sanity and insanity] are rather matters of fact than of law; or at most partly of law, and partly fact." This sentence is omitted from later editions, and the text today reads as it did originally: "In like manner, every man is presumed to be of sane mind, until the contrary is shown; but, if derangement or imbecility be proved or admitted at any particular period, it is presumed to continue, until disproved, unless the derangement was accidental, being caused by the violence of a disease." 1 Greenleaf on Evidence (16th ed.) 140, § 42, and see Note 3. Other texts supporting this view are: 3 Bishop's New Criminal Procedure 1650, § 674; 2 Chamberlayne, The Modern Law of Evidence, 1241, § 1043; 28 Am. Jur., Insane and Other Incompetent Persons, 751, § 121; 20

Am. Jur., Evidence, 207, § 209; 31 C. J. S., Evidence, 740, § 124. See, also, Annotations, 68 A. L. R. 1315 and 7 A. L. R. 588.

In view of the wealth of authority that accords with our own precedents, we are not disposed to depart from them.

■■ In numerous cases the presumption has been given effect as determining where the burden of proof lies. See, *In re Dugan*, supra, *Johnson v. Johnson*, supra; *In re Kehler* (CCA 2d), 159 Fed. 55; *Francks v. State*, 109 Tex. Crim. Rep. 440, 5 S. W. 2d 157; *Armstrong v. State*, 30 Fla. 170, 11 So. 618, 17 L. R. A. 484; *Criez v. Sunset Motor Co.*, 123 Wash. 604, 213 P. 7; *State ex rel. Thompson v. Snell*, 46 Wash. 327, 89 P. 931, 9 L. R. A. (n. s.) 1191; *In re Brown*, 39 Wash. 160, 81 P. 552. In this state the burden of proof in cases of this kind is governed by statute. The defense of insanity must be proved beyond a reasonable doubt: § 26-929, O. C. L. A. (held constitutional in *State v. Grieco*, 184 Or. 253, 195 P. 2d 183). The effect of the presumption, therefore, is not to shift the burden of proof, though it may be to impose upon the state the burden of going forward with the evidence. *Weihofen*, supra. See, *Hansen v. O.-W. R. & N. Co.*, 97 Or. 190, 210, 188 P. 963, 191 P. 655. Under our decisions a presumption of law is evidence, and it is the duty of the court, when requested, to instruct the jury upon such a presumption: *Ritchie v. Thomas*, 190 Or. 95; *Wyckoff v. Mutual Life Insurance Co.*, 173 Or. 592, 147 P. 2d 227; and, after all the proofs are in, "the presumption remains in the case to be considered by the jury as evidence." *Hansen v. O.-W. R. & N. Co.*, supra, 97 Or. 224.

The following decisions are authority for the pro-

priety of instructing on the presumption in criminal cases: *Weatherford v. State,* 51 Tex. Crim. Rep. 430, 103 S. W. 633; *Yantis v. State,* 95 Tex. Crim. Rep. 541, 255 S. W. 180; *Allams v. State,* 123 Ga. 500, 51 S. E. 506; *State v. Reddick,* 7 Kan. 143; *Wagner v. State,* 116 Ind. 181, 18 N. E. 833; *State v. Brown,* Houst. Cr. (Del.) 539 (nisi prius); *People v. Francis,* 38 Cal. 183; *State v. Lowe,* 93 Mo. 547, 5 S. W. 889; *State v. Robbins,* 109 Ia. 650, 80 N. W. 1061; *State v. Wilner,* 40 Wis. 304.

In the last three of the foregoing cases judgments of conviction were reversed because the trial court refused to instruct on the presumption. In *State v. Wilner,* a homicide case, the requested instruction was substantially in the language of the one here under consideration. Notwithstanding the imperfection in the request, it was held to be reversible error to refuse to give a proper instruction on the subject. The court said:

> "The instruction would doubtless have been more accurately phrased had it been restricted in terms of habitual insanity. But the prisoner's delusion did not appear to be occasional, but permanent. The jury could not have misunderstood the application of the instruction to the case before them. And we could not sustain judgment for a high crime, upon refusal to give an important instruction, solely on the ground of verbal inaccuracy. In such a case, it would be the duty of the presiding judge to correct the inaccuracy and give the instruction."

The court concluded by saying, in answer to the state's contention that the defendant's conduct in the commission of the homicide did not indicate insanity:

> "* * * It is universally recognized that, except perhaps in cases of total loss of reason, insanity

does not always exhibit itself in the language or acts of the insane. And it may well be that the jury believed, for want of the instruction refused, that they might assume the prisoner's sanity, at the time of the homicide, from the circumstances accompanying and immediately preceding it, without giving any effect to the evidence of her previous delusion. That evidence, as we read it in the bill of exceptions, appears to us so convincing as to make it difficult to account for the verdict of guilty in any other way."

As in the Wisconsin case, the defendant's requested instruction here is defective in that it is not limited to a chronic, habitual or permanent type of insanity. Ordinarily, we would apply the established rule and not reverse the court below for declining to give a requested instruction which is technically inaccurate. But the same reasons which influenced the Wisconsin court to take a different course should govern our decision. The evidence points with great force, not to intermittent insanity or temporary aberration, but to a mind diseased over a long period of years, probably since 1943 when the defendant was discharged from the Army. It shows "insanity of a continuing nature, or possessed of the characteristics of an habitual or confirmed disorder of the mind, as distinguished from temporary or spasmodic mania, or disorders of mind produced by the violence of disease". *Thomson v. State,* 78 Fla. 400, 83 So. 291. It is highly improbable that the jury would have been misled by the instruction or would have taken it as applicable to any other state of affairs than that revealed by the evidence. The defendant is under sentence of death, and the consequences of a possible miscarriage of justice should weigh heavily in the scales against considerations of the niceties of trial practice. Either the instruction as

requested, or a technically correct instruction involving its principle, should have been given; to refuse it was reversible error. We are the more inclined to this view because of the harshness of the statute which imposes on the defendant the burden of proving his insanity beyond a reasonable doubt.

The state argues in its brief that the instruction was properly refused because, first, a prior adjudication of insanity cannot be conclusive upon the question whether the defendant was legally insane at the time of the commission of the act charged, and, second, because the type of insanity for which one may be committed to the State Hospital for the Insane is not necessarily the same type of insanity which relieves a person from the consequences of committing an unlawful act.

█ As to the first contention, it need only be said that the presumption is a disputable one and not conclusive of anything; although an adjudication of insanity is conclusive as to the mental condition of the subject of the adjudication at the time that it is made. § 2-718, O. C. L. A. That the decision of the County Court of Coos County was a judgment, see *In re Sneddon,* 74 Or. 586, 589, 144 P. 676.

█ As to the second contention, it is quite true that one need not be legally insane in order to justify a finding that he is a mentally diseased person and thus warrant commitment to the State Hospital. Neither is there any question but that the defense of insanity is not made out unless it is proved beyond a reasonable doubt that, at the time of the commission of the act charged, the accused was so diseased in mind that he was incapable of understanding the nature and quality of the act, or of distinguishing between right and wrong

with respect to the act charged. These considerations, however, are not relevant to the question whether the presumption is applicable. The evidence of prior adjudications of insanity was admitted without objection, and the state quite correctly says in its brief: "That such adjudication may be considered as evidence of the defendant's ability [i.e., inability] to determine the difference between right and wrong at the time charged, but only as evidence, has been well established in many of the several jurisdictions." To hold that the presumption exists and that the court must instruct upon it is in no sense inconsistent with the statement just quoted, for the presumption only enables the jury to give to the evidence, which concededly. they have a right to consider, its just effect.

■ Beyond this, we have the evidence already referred to, that the Circuit Court for Multnomah County found the defendant not guilty of a crime on the ground of insanity. Here is an adjudication of legal insanity—somewhat more remote, it is true, than the commitment by the County Court of Coos County—but not too remote to be admissible in evidence. The defendant was entitled to the benefit of the presumption arising from the Circuit Court's judgment as well as that arising from the commitment.

In view of a new trial other assignments of error must be noted.

Over defendant's objection the court permitted Police Patrolman Reed Beeh to testify to a statement made by the victim, Ancell Abbott, concerning the cause of his death. The statement was received as a dying declaration.

According to the evidence the declaration of Abbott was made in the Good Samaritan Hospital while he lay

on the operating table some two hours before he died. Beeh testified: "Mr. Abbott was laying there moaning and groaning with pain and made a statement that, 'I am dying, I am dying; why don't you do something? My leg is paralyzed,' and also one time said, 'My stomach is all swelling up.'" Dr. H. Minor Nichols, who operated on Abbott, was called from his home about midnight of January 3, 1949, to the Good Samaritan Hospital. He testified: "When I looked at this man I was sure he wasn't going to make it", and that his experience was that multiple bullet wounds going through the upper abdomen and transversely (the wounds from which Abbott was suffering) are "pretty apt to be 100 per cent fatal." The operation consumed about an hour, and, as it was concluded, the patient died.

■ Evidence may be given in both civil and criminal cases of the declarations of a dying person, made under a sense of impending death, respecting the cause of his death. 1 O. C. L. A., § 2-228 (4). Two conditions must exist to make a dying declaration admissible: (1) the declarant must be *in extremis*, and (2) it must have been made in the conscious belief that death was impending and without hope or expectation of recovery. *Mercep v. State Ind. Acc. Com.*, 167 Or. 460, 469, 118 P. 2d 1061, and cases there cited.

■ The ruling of the Circuit Court was clearly right. *State v. Casey*, 108 Or. 386, 399-402, 213 P. 771, 217 P. 632. It is not argued, and we do not see how it could be, that admission of the declaration was not well within the discretion of the trial judge. It is contended, however, that because of the language, "Why don't you do something?", used by Abbott, reasonable minds might differ as to whether or not he still hoped

to survive, and that, therefore, the court should have advised the jury that it was for them ultimately to determine whether the statement made by Abbott was in fact a dying declaration. No request for such an instruction was made by defendant's counsel, and there is no assignment of error directed to its omission. Nevertheless, we shall state our views.

■ The competency of a dying declaration is for the court; its weight for the jury. *State v. Casey,* supra. In *State v. Doris,* 51 Or. 136, 94 P. 44, 16 L. R. A. (n. s.) 660, this court reversed a judgment of conviction for the reason, among others, that the court instructed the jury that dying declarations admitted in evidence "are entitled to be considered by you as other evidence in the case given by witnesses under oath before you" (51 Or. 145). The court said:

> "* * * Where but one deduction can reasonably be drawn from the testimony, and is to the effect that the declaration was made *in extremis,* under a sense of impending death, the court must admit the declaration; and its admission is conclusive upon the jury, which, under such circumstances, should be so instructed. But, if the predicate for the dying declaration appears doubtful, and of such character that men of average reason and prudence might draw different conclusions therefrom, the inquiry then becomes one of fact, and must finally be submitted to the jury." (51 Or. 147)

The question was said to be analogous to that arising upon the admission of a confession, when the court determines admissibility in the first instance, and finally submits to the jury the question of the voluntary character of the confession. The court concluded:

> "The statement in the instruction as given, to the effect that the declaration of the deceased should

be considered, and is entitled to the same weight as any other evidence offered, is too broad, and is subject to qualification. It would have been proper to have instructed the jury to the effect that, if they determine that the declarant was in extremis and the declaration was made under full belief of impending death, they may give the statements the same weight as they would if the declarant were living and made the statements attributed to him, or had given testimony of similar import, under oath, from the witness stand, without cross-examination thereon, proper consideration being given and due allowance being made to all circumstances surrounding the declarant when the statement was made, together with his physical as well as mental condition, including any apparent influence, if any, under which he might have been laboring at the time.'' (51 Or. 155)

■ Since an inference, however weak, might be drawn from the words ''Why don't you do something?'' that the declarant had hope of recovery, we think it would have been proper to charge the jury in the manner indicated in *State v. Doris*. To do so would not be, as the state argues, to comment on the evidence, but simply to advise the jury about a question of fact which they were authorized to determine.

The district attorney called to the witness stand three psychiatrists, and, on the basis of a hypothetical question propounded to each of them, elicited their opinion that the defendant knew the difference between right and wrong at the time of the commission of the act charged. The same hypothetical question was addressed to each of the expert witnesses. Defendant's counsel objected to the question on the grounds ''that the hypothesis contained a lot of things that have no bearing upon whether this defendant knew right from

wrong", that the hypothesis was not based upon the facts adduced in the case, and that the question was "a deliberate attempt by the office of the district attorney to review the evidence in this case." The court overruled the objections, and the rulings are assigned as error.

■ Counsel for the defendant expressly admitted on the oral argument that no fact assumed in the question is unsupported by the evidence. The defendant's brief states as a proposition of law that a hypothetical question, propounded to an expert witness who has not heard the testimony, must embody all the material facts in evidence affecting the question upon which the expert is called upon to express an opinion, and should include none which are unrelated, and cites as authority: *State v. Garrison,* 59 Or. 440, 117 P. 657; *State v. Riley,* supra; together with several cases from other jurisdictions. But counsel has not called our attention to any material fact which was omitted, nor to any unrelated fact which was included. In that situation it can hardly be the duty of the court to search for defects in the question.

■ In *State v. Wallace,* supra, 170 Or. 74, 131 P. 2d 222, we quoted a passage from Wigmore on Evidence, Vol. I, p. 9, § 288, in which the author says, speaking of evidence admissible on the issue of insanity:

> "The first and fundamental rule, then, will be that *any and all conduct* of the person is admissible in evidence."

■ This rule seems to have been carefully observed in the trial of this case, especially in the admission of evidence on behalf of the defendant. The hypothetical question which is attacked is long, and, in view of the manner in which the argument has been presented

against it, we see no reason for setting it out here. It is sufficient to say that it is a fair summary of the life and conduct of the defendant and of the facts relating to the alleged crime, as disclosed by the testimony. And we are unable to say that the court erred in permitting the question to be answered.

■ Error is assigned to the ruling of the court admitting in evidence State's Exhibits 6 and 7, which are photographs of the body of Ancell Abbott and were used by Dr. Nichols in illustrating his testimony. The objection to the pictures is that they are gruesome. The pictures were taken at the morgue. One showed the bullet wounds in Abbott's body, and one showed his face. They were material evidence tending to prove the cause of death, to corroborate the evidence of eye witnesses to the alleged crime, and to aid in identification of the murdered man. The fact that the pictures are also gruesome does not affect their admissibility as evidence. Our recent decisions have put the question to rest. *State v. Grieco,* 184 Or. 253, 195 P. 2d 183; *State v. Henderson,* 182 Or. 147, 184, 184 P. 2d 392; *State v. Nelson,* 162 Or. 430, 453, 92 P. 2d 182; *State v. Weston,* 155 Or. 556, 563-580, 64 P. 2d 536, 108 A. L. R. 1402.

In a single assignment of error the defendant has presented objections to several evidentiary rulings. These we will discuss briefly. The court sustained the state's objection to the following question put to the state's witness, Leland Marshall, on cross-examination by defendant's counsel: "Isn't it a fact, Lee, that you thought he [the defendant] was crazy?" The court, on motion of the state, struck from the record, and instructed the jury to disregard, the answer of the witness, Rena Garver, as follows: "A. Well, I think

he [the defendant] has been going crazy and I don't know, you just never know what he was going to do." The court struck from the record, and instructed the jury to disregard, the testimony of Gertrude Mitchell, mother of the defendant, that he was "in such a terrible shape" and that he was "mentally and physically ill".

■ The witness, Leland Marshall, an accomplice of the defendant, was not shown to be his "intimate acquaintance", and hence was not competent to give an opinion as to his "mental sanity" as provided by § 2-228, O. C. L. A. No error was committed in sustaining the objection to the question.

■■ The witness, Rena Garver, is a sister-in-law of the defendant. It was within the discretion of the trial judge to determine whether she had that degree of intimacy with the defendant which would make her a competent witness upon the question of his sanity. *State v. Hansen*, 25 Or. 391, 395, 35 P. 976; *State v. Murray*, 11 Or. 413, 424, 5 P. 55. From an examination of the testimony in that regard we cannot say that this discretion was abused.

■ As to the testimony of Mrs. Mitchell, if there was error in striking her statement that the defendant was mentally ill, it was cured when later she was permitted to give her opinion that he was insane.

■ Apparently, the court struck the phrases used by her, "such a terrible shape" and "physically ill", on the theory that they were the opinions or conclusions of the witness. The general rule, of course, is that a lay witness may testify only to facts and not to opinions or conclusions. But lay witnesses are frequently permitted to use so-called "short hand" descriptions, in reality opinions, in presenting to the court their impres-

sion of the general physical condition of a person. 3 Jones on Evidence (2d ed.) 2306, § 1252. This court has held it proper in a personal injury case to permit laymen, who were intimately acquainted with the plaintiff prior to her injury and observed her condition thereafter, to testify that her health and general physical condition had materially changed for the worse. *Crosby v. Portland Ry. Co.*, 53 Or. 496, 504, 100 P. 300, 101 P. 204. *Hartley v. State Ind. Acc. Com.*, 123 Or. 310, 312, 261 P. 71, approves and follows this decision. This seems to us to be a common sense view of the matter. It leaves the witness free to speak his ordinary language, unbewildered by admonitions from the judge to testify to facts, when all the while the witness is sure in his own mind that he *is* testifying to facts. The jury understands what the witness means, and the right of cross-examination removes the likelihood of harm to the other side. Too strict an adherence to the ''opinion'' rule is undesirable. See, 2 Wigmore on Evidence (3d ed.) 660, § 568. When a witness of less than ordinary education and powers of expression is on the stand, technical rulings not infrequently result in bickerings between counsel and vain attempts of the court to make the witness comply with its rulings; while in the end the opinion of the witness usually comes out anyway, and nothing whatever is gained.

Mrs. Mitchell was a fairly intelligent witness, but she became so confused by the objections and rulings that at one time she said to counsel for the defendant: ''Mr. Johns, I don't know what you mean by—when you ask me a question and I answer it to the best of my ability; I don't know what you mean for me to answer. I just try to tell what you ask me.'' A little later, after another of her answers was stricken, she said: ''* * *

I don't know how to express it; when I say what was in my heart then it is stricken from the records.''

■ Mrs. Mitchell related to the jury the history of her son from infancy to the day of the alleged crime—including his illnesses, both mental and physical; his hospitalizations; his moral delinquencies; and his crimes—whatever might throw light on his mental condition. She used the expression "in such a terrible shape" when trying to explain why she had not taken the defendant back to the State Hospital as she had intended to do, and immediately afterwards said: "He asked me if he could get build up a little bit before he went back up there." She testified that "he was mentally and physically ill" in answer to a question as to why the defendant did nothing when he was at home with her in December, 1948. Presumably, she knew as much about his condition of health as any lay person could. Before giving the testimony which was stricken, she had described his former physical appearance to the jury, told of his robust health, and how he had lost sixty pounds during a certain period. The ruling complained of may not have been reversible error; but the same reasons which led the court in the cases cited to approve the admission of testimony of lay witnesses that a person injured in an accident was in a worse condition of health after the accident, than before, impel us to hold that the court should have let the stricken testimony stand.

■ The only other assignment of error (save one that is expressly waived) is based upon the use by the court of the word "neglect" in the following instruction: "I further instruct you that no inference or presumption of guilt arises against the defendant by reason of his neglect to testify in his own behalf." We agree

with counsel for the defendant that the word "neglect" is not happily chosen in this context. "Election not to testify" would have been better. We also agree with counsel for defendant that the error, if such it can be called, would not be ground of reversal.

For the error in refusing to give the instruction on the presumption of continuing insanity, the judgment is reversed and the cause remanded for further proceedings in conformity to this opinion.